CLARA V. GLANVILLE, Appellee, v. CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY, Appellant.

**NEGLIGENCE: Contributory Negligence—Obstructed Crossing, etc.** A 1    traveler may be saved from the imputation of negligence *per se* by the fact that, as he approached a partially obstructed railway cross-

ing, he was bundled up with heavy clothing, was in a cramped posi-
tion on the back seat of the vehicle, with curtains down, and had,
at best, but an imperfect view through the side openings in said
curtains.

**NEGLIGENCE:   Necessity for Automatic Signaling Device or Flagmen.**
2  Failure to maintain an automatic signaling device or a flagman at
a railway crossing furnishes no basis for a charge of negligence,
in the absence of evidence that the crossing was, owing to its situ-
ation, surroundings, and use, so unusually dangerous that the ordinary
statutory signals were inadequate to reasonably protect the public.

**NEGLIGENCE:   Failure to Give Statutory Signals.**   Record reviewed,
3  and held to justify the submission of the issue whether the railway
employees were negligent in failing to give a whistle signal at a
public crossing.

*Appeal from Wayne District Court.*—H. K. EVANS, Judge.

DECEMBER 14, 1920.

ACTION for damages consequent on a collision of an auto-
mobile with a railway train, resulted in judgment for plaintiff.
The defendant appeals.—*Reversed.*

*F. W. Sargent, J. G. Gamble,* and *Miles & Steele,* for appel-
lant.

*Carter & Bracewell,* for appellee.

LADD, J.—Plaintiff, with her family, had moved from a farm
about 8 miles northwest of Lineville to that town in September,
1917, and had taken up her residence on the south side of Mill
Street, about 1½ blocks east of the crossing of that street by
defendant's railroad.  Through arrangement with her husband,
Claude Hesseltine, a boy 18 years old, on October 13th took
plaintiff and her husband, with two of her children, in his
father's Ford automobile to the farm to get vegetables they had
raised.  Shortly after 4 o'clock in the afternoon, they returned
by way of and turning south on Washington Street, about a half
mile directly north of its intersection with Mill Street, and east
into Mill Street, and, in crossing the defendant's railway, the
automobile was struck by one of defendant's trains coming from

the north, causing the injuries of which the plaintiff complains. The petition alleges that defendant was negligent (1) in operating its train at a dangerous rate of speed, in violation of statute and of an ordinance of the town of Lineville; (2) in failing to ring the bell and sound the whistle on the engine, as required by law; and (3) in omitting to keep a flagman at the crossing at Mill Street, or else an automatic signaling device. There was the usual allegation that plaintiff was without fault, and this, in addition to a general denial, was specifically controverted by the answer, which also averred that plaintiff and Hesseltine were engaged in a joint enterprise, and also that he was acting as her agent in operating the car. Though these last two issues were submitted to the jury, they were without support in the evidence, and for that reason require no further attention. Only the assignments of error argued will be considered, and these are: (1) That the evidence conclusively proved plaintiff to have been guilty of negligence contributing to her injuries; (2) that the evidence was insufficient to go to the jury on the issue as to whether defendant was negligent in failing to install an electric signaling device or maintain a watchman at the Mill Street crossing; (3) that the court erred in submitting whether the defendant was negligent in failing to sound the whistle; and (4) the court erred in giving Instruction No. 1.

I. Counsel for appellant contend that contributory negligence was proven conclusively, and that, on that ground, verdict should have been directed for the defendant. It appears that, in returning from the farm, plaintiff rode in the back seat of the automobile, with her husband at her right. The daughters rode in the seat with Hesseltine, who operated the car, the son having returned another way. As the automobile turned south into Washington Street, Hesseltine and Glanville claimed to have had a clear view of the defendant's railway track to the east of north, the former a distance of about three miles, and the latter one and one-half miles, and that neither observed a train. As the automobile turned east on Mill Street, these men appear to have observed smoke and a train to the south, and to have watched to see whether it was moving northward. Neither

1. NEGLIGENCE: contributory negligence: obstructed crossing, etc.

looked to the north until the train was upon them. The railroad ran east of north, nearly parallel with Washington Street, cutting the block immediately north of Mill Street and east of Washington Street, and, a half mile north, was two and one-half blocks east of Washington Street. The northeast corner of the intersection of Washington Street and Mill Street is 90½ feet west of the center of the railroad track, and the center of Mill Street on the east line of Washington Street is 84 feet west of the center of the track. There is a rise in this last distance of 4.68 feet: that is, from the surface of the east line of Washington Street to the top of the rails. From the top of the rails to a point 150 feet east of the center of the track, there is a fall in Mill Street of 13.2 feet. The southeast corner of a house 27 feet square is 35 feet north of a point on the north side of Mill Street, and 49 feet west of the railroad track. The southwest corner of the house is 14.5 feet from Washington Street. Its east side, extended south along Mill Street is 54 feet from the track. To the north, there are 7 houses in the same block,—that is, in a distance of 600 feet. The house described obstructed the view of the railroad more or less, until the automobile was about 54 feet west of the crossing. Though the house obstructed plaintiff's view, she could see from there on, and, in keeping a lookout, was bound to exercise such reasonable care as an ordinarily prudent person would exercise in like situation. She was entirely familiar with the surroundings, and was aware of it when the automobile turned on Mill Street, as her home was but a short distance beyond the crossing. Her testimony was that she—

"Was very tired from working all day. I had a heavy coat on, and couldn't move extra well, the position I was in the car. I really left it to them to see; I supposed they were seeing. * * * Q. I will ask you if, at any time previous to the collision, you looked out of the automobile in either direction towards the railroad track. A. To the right or the left? Q. Either side or either direction. A. No, sir. Q. Did you at any time notice a train coming from the north? A. No, sir. Q. Did you see the track before you approached it? A. Just straight ahead. After we turned into the east and west road, and were proceed-

ing east on Mill Street, I looked to see if a train was coming from the north.''

Omitting the last-above-quoted sentence, counsel for appellant argue that her answers conclusively prove her to have been guilty of contributory negligence. An amendment to the abstract adds that sentence to what precedes, and, as there is no denial, we must regard it as a part of the record. The curtains of the automobile were down, but these had openings, with some kind of transparent material, probably celluloid, inserted. In front of her and Glanville, though, behind the front seat, were two sacks of beans, a sack of potatoes, apples, tomatoes, and possibly other truck from the garden. In this situation, with the driver in front, husband at her side, and her view somewhat interfered with by the curtains, how does what she claims to have done measure up with what might reasonably have been expected of a person of ordinary prudence, in like situation? One sitting in a back seat is not in a situation to maintain as adequate a lookout as the driver or other person in the front seat, especially when the curtains are down. If he looks out in front, his view is narrowed, so that he is not likely to see far on either side; if he looks through the transparent substance inserted in the curtains, he must adjust his position to see, and would be likely to experience some difficulty in fixing his relations with surrounding objects. Other interferences with obtaining an adequate view through the curtains by plaintiff were her coat, and the vegetables about her. She could not, in any event, have obtained a clear vision of the track until beyond the obstruction of the house, which would be only about 60 feet from the track; and, as the train then might have been 180 to 240 feet north of the crossing, she might have looked to the front without observing; and whether she saw or might have seen through the curtains depended upon the situation she was reasonably able to take, in her surroundings. In the nature of things, one in the back seat of an automobile will not be as vigilant as he would, were he in the front seat. He may see better from the latter, and is likely to be more at attention than when in the back seat; and there is a degree of relaxation and reliance on the lookout of those ahead; and this is somewhat enhanced by the fact of being a guest. These are matters to be

taken into account in connection with plaintiff's situation in the automobile, wrapped in a heavy cloak, with the sacks and vege-- tables about her, and with the curtains down, together with her story of what she did, and the lawful speed at which trains should move; and, as we think, this left the issue open as to whether plaintiff exercised such a degree of vigilance as a per-- son of ordinary prudence would, under like circumstances. The case is readily distinguishable from *Beemer v. Chicago, R. I. & P. R. Co.*, 181 Iowa 642, and *Sackett v. Chicago G. W. R. Co.*, 187 Iowa 994. As to the care to be observed by guests, see *Willis v. Schertz*, 188 Iowa 712; *Wagner v. Kloster*, 188 Iowa 174. The issue of contributory negligence was for the jury.

II.   The court submitted as a ground of negligence the defendant's failure to maintain at the Mill Street crossing a watchman or an automatic signaling device, to warn travelers of the approach of trains. This is said to have been error, for that the evidence was insufficient to carry that issue to the jury. Lineville, at the time in question, had about 750 inhabitants.

2. NEGLIGENCE:
necessity for
automatic sig-
naling device or
flagmen.

Mill Street, though said to be one of the main thoroughfares, is not what is known as a business street. It appears, from the map submitted, to have been four blocks north of the main business portion of the town, though there was a church and carriage works two blocks south, and a hotel a block farther on. The extent of travel on Mill Street was not shown, further than that the street was well traveled, and was a highway into the country to the east. The crossing is on somewhat of an embankment, the road rising, in a distance of 150 feet east of the track, 13.2 feet, and descending to the west to Washington Street, 4.68 feet. From a point 54 feet west of the track, a traveler about to cross would have a clear view of the track to the north for over one-half mile. As the railroad, in going north, veered to the east, buildings on that side of the track might obstruct the view, in approaching the track from the east, but there were no such obstructions, or others, proven. The crossing was planked 24 feet wide, so that there was ample room for vehicles to pass each other. For all that appears, there is an adequate view along the right of way to the south. About 15 trains passed over the road per day. There was nothing to indicate that the usual

signals sounded by the approaching trains could not be heard. There was no evidence of any congestion of travel or of traffic. The record is wanting of any adequate showing of conditions ordinarily held to necessitate keeping a flagman or maintaining a signaling device at a highway crossing. Under what circumstances a railroad company is required to keep a flagman at a crossing, or to maintain some device for warning persons of an approaching train, is not prescribed by statute. It is only to be done when ordinary statutory signals are insufficient as warnings to travelers about to make use of a crossing of unusual danger, and the railroad company, in the exercise of ordinary care, is required to give other notice or warning, additional to those ordinarily given. It follows that it is not obligatory on the railroad companies to station a flagman or install a signaling device at every railway crossing a public highway. As said in *Annaker v. Chicago, R. I. & P. R. Co.*, 81 Iowa 267:

"It is not negligence *per se* for a railway company to omit to keep a flagman at every street or highway crossing, at any given hour of the day or night. Whether such omission is negligence depends upon the circumstances, such as the frequency with which trains are passing, the amount of travel, the opportunities, or want of opportunities, for travelers observing the approach of trains, and the like."

In *Grand Trunk R. Co. v. Ives*, 144 U. S. 408 (36 L. Ed. 485), the duty of railroads to maintain flagmen at crossings was thoroughly considered, and the court, speaking through Lamar, J., concluded that:

"The reason for such rulings is found in the principle of the common law that everyone must so conduct himself and use his own property as that, under ordinary circumstances, he will not injure another, in any way. As a general rule, it may be said that whether ordinary care or reasonable prudence requires a railroad company to keep a flagman stationed at a crossing that is especially dangerous, is a question of fact for a jury to determine, under all the circumstances of the case, and that the omission to station a flagman at a dangerous crossing may be taken into account as evidence of negligence; although, in some cases, it has been held that it is a question of law for the court. It seems, however, that, before a jury will be warranted in saying,

in the absence of any statutory direction to that effect, that a railroad company should keep a flagman or gates at a crossing, it must be first shown that such crossing is more than ordinarily hazardous: as, for instance, that it is in a thickly populated portion of a town or city; or that the view of the track is obstructed, either by the company itself or by other objects proper in themselves; or that the crossing is a much traveled one, and the noise of approaching trains is rendered indistinct, and the ordinary signals difficult to be heard, by reason of bustle and confusion incident to railway or other business, or by reason of some such like cause; and that a jury would not be warranted in saying that a railroad company should maintain those extra precautions at ordinary crossings in the country.''

Numerous authorities are cited in support of this conclusion, and the decision was followed in *Baltimore & Ohio R. Co. v. Adams,* 10 App. D. C. 97, in holding that, at a crossing near the city of Washington, not more than ordinarily hazardous, the company was under no obligation to maintain a flagman. In *Hubbard v. Boston & A. R. Co.,* 162 Mass. 132 (38 N. E. 366), the court observed that:

''Ordinarily, it is a question of fact for the jury to determine in each particular case whether the warnings imperatively required by the statute to protect the public at railroad crossings are sufficient for that purpose, or whether additional precautions for their safety are necessary. But, in order to authorize a jury to find negligence in not taking such additional precautions, there must be evidence beyond the mere fact that there is a public way crossed by a railroad at grade. There must be something in the configuration of the land, or in the construction of the railroad, or in the structures in the vicinity, or in the nature or amount of the travel on the highway, or in other conditions, which renders ringing the bell and sounding the whistle inadequate properly to warn the public of danger.''

See *Newport News & M. V. Co. v. Stuart's Admr.,* 99 Ky. 496 (36 S. W. 528); *Delaware, L. & W. R. Co. v. Shelton,* 55 N. J. L. 342 (26 Atl. 937); *Freeman v. Duluth, S. S. & A. R. Co.,* 74 Mich. 86 (3 L. R. A. 594). See, also, extensive note to *Folkmire v. Michigan United R. Co.,* 157 Mich. 159 (17 Ann. Cas. 979). The law seems to be fully settled that a railway

company is required to station a flagman or install electric or other signaling devices only when, owing to its situation, surroundings, or use, the crossing is more than ordinarily dangerous; so dangerous and of a character such that other than statutory warnings are essential to the reasonable protection of travelers on the highway, about to cross the railroad tracks. We are of opinion that the evidence was insufficient to carry that issue to the jury, and that the court erred in submitting it.

III. The train consisted of 10 cars, besides the engine, and when it reached the crossing 2,700 feet north of Mill Street, the corporation boundary, it was moving, according to the

3. NEGLIGENCE: failure to give statutory signals.

engineer, 25 or 30 miles an hour. He testified that the speed had then slackened; that the grade was down; that, as he passed over a "hump in the grade" farther on, he shut off the steam and allowed the train to coast down; and that, upon approaching Mill Street, it was moving from 14 to 18 miles an hour. An ordinance of Lineville. limited the speed in the corporate limits to 8 miles an hour; and, in view of this, and of the fact that the train might have been found to have been moving more than twice the speed permitted, and without the noise made when steam is on, we are of opinion that the court did not err in submitting to the jury whether defendant was not negligent in not sounding the whistle as the train approached Mill Street. See *Kinyon v. Chicago & N. W. R. Co.*, 118 Iowa 349, and like decisions. The first instruction given, as applied to the facts of the case, was not erroneous. Because of the error pointed out, the judgment is—*Reversed.*

WEAVER, C. J., STEVENS and ARTHUR, JJ., concur.