(No. 5744.   December 28, 1931.)

ED. DILLON, Appellant, v. W. M. BROOKS and E. E.
BROOKS, Copartners, Doing Business Under the Firm
Name and Style of BROOKS OVERLAND COMPANY,
Respondents.

[6 Pac. (2d) 851.]

Walter Griffiths and T. A. Walters, for Appellant.

Rhodes & Estabrook, for Respondents.

GIVENS, J.—Appellant, Mr. Sponsler, Mr. Conley and W. M. Brooks arranged to take a ,fishing trip. Brooks took them in his car to demonstrate it to Mr. Conley.

In returning from the trip, on May 19, 1929, while overtaking and passing a Ford, the car driven by respondent swerved, skidded, reversed ends, and overturned, severely injuring appellant and some of the other occupants. Appellant brought this action for damages because of his personal injuries. The jury found for the driver, and against appellant, the guest, or occupant of the automobile.

It is urged that the evidence so overwhelmingly shows negligence on the part of the driver as to demand a reversal. From a careful perusal of the testimony, however, it is evident that reasonable minds might well differ and exculpate respondent; hence, this phase of the controversy involved a question of fact for the jury which they resolved in respondent's favor.

Appellant contends that the answer did not properly or sufficiently present the defense of contributory negligence predicated by respondent on appellant's failure to make a timely protest against the claimed negligent acts of respondent immediately prior to, and at the time of the accident.

The complaint alleged "negligent, reckless and unlawful rate of speed," "management and operation," and "manner." The answer admitted the accident, but denied negligence, etc., and affirmatively alleged "that the plaintiff (appellant) herein did not at any time make any complaint, objection or protest as to the manner or method in which the said car was driven, operated, or propelled by" respondent. This sufficiently raised the issue of contributory negligence on the part of the gratuitous guest or occupant of the automobile, counterpoised to the negligence alleged in the operation thereof. (*Dale v. Jaeger*, 44 Ida. 576, 258 Pac. 1081; Berry on Automobiles, secs. 654, 665.)

Appellant urges that the court erred in giving instructions Nos. 9 and 10, and refusing to give appellant's requested instructions Nos. 9, 10, 11, and 12.

Appellant urges that in instruction No. 9 as given, the court told the jury as a fact that respondent was at the time of the accident acting as a reasonable and prudent man. While the instruction could, and should, have been more carefully worded to avoid such implication, when considered in connection with instructions Nos. 5 and 6 on "negligence" and "ordinary care," we do not believe the jury was misled

Instruction No. 10 was as follows:

"You are instructed that a gratuitous guest may not recover for his host's negligent operation of an automobile, if conscious of apparent danger or faced with such conditions and circumstances as would herald danger to a reasonably prudent man, he fails opportunely to protest or acquiesces therein.

"And if you find from the evidence in this case that the plaintiff knew, or as a reasonably prudent man should have known, the defendant W. M. Brooks was driving and operating his automobile in a dangerous manner, and you further find said plaintiff after a seasonable opportunity so to do, failed to opportunely protest against such dangerous driving and operation of said automobile, then and in that event plaintiff cannot recover."

The first paragraph is a *verbatim* copy of syllabus No. 1 in *Dale v. Jaeger, supra,* and the second paragraph reasonably follows the rule announced in that case, which is also supported by other authorities. (Berry on Automobiles, secs. 654, 665, and cases cited.)

Appellant contends that there is no evidence to justify this instruction. Consideration of this point requires an analysis of the pertinent testimony.

Appellant testified as follows:

"Q. How far back from the Ford car was it before he sounded his horn? A. Oh, the first time?

"Q. Yes, sir, the first time. A. Well—well, he started to pass the Ford car once before this more than—

"Q. I mean at the time he passed. A. Well, I should say about—oh, thirty feet maybe, the first time he honked the horn.

"Q. And then he honked the horn again. A. Yes, sir.

"Q. Where was he then. A. Still closer to him.

"Q. Where was the Ford car then. A. Right in front of him.

"Q. And on which side of the road. A. I would say virtually in the center.

"Q. Did the Ford car turn to the right when he honked the horn. A. Well, I could not say.

"Q. When Mr. Brooks started to pass the Ford car, was there sufficient room for him to pass on the left. A. Well, he got by.

"Q. Please answer the question. Was there sufficient room. Answer just as you recall. A. You mean—You mean, did I consider it room to have driven by?

"Q. Yes, sir. A. No, sir; I would not consider it sufficient for me.

"Q. Did you know that Mr. Brooks was about to pass. A. Well, he was honking the horn.

"Q. Well, did you say anything or object to his passing the Ford car at that time. A. No, sir.

"Q. Did the Ford car turn to the left after Mr. Brooks sounded the horn the last time. A. I could not say. I was riding on the left side of the car with the bedding and camp equipment between me and Sponsler, piled up between us.

"Q. The Ford car was to the right of you. A. Yes, sir.

"Q. And you could see the Ford car at all times. A. Well—I might have been able to do it if I had turned my attention to the Ford car; but—but, I did not look for it all the time.

"Q. Yes. As a matter of fact you did not pay any attention to it. Is that right. A. Well, is the object of the question to know—

"Q. Please answer my question. Did you pay any attention to the Ford car or Brooks who was driving the Studebaker car. A. Well, I was scared, I know.

"Q. And when you were scared did you say anything at all. A. No, sir.

"Q. How long had you been scared. A. Well, just when he went to go by that car.

"Q. Well, did he apparently put his foot on the accelerator. A. Apparently did, yes.

"Q. To pass the car. A. Yes, sir.

"Q. Did you at that time think there was anything wrong about that. A. What is the question.

"Q. Did you think at that time there was anything wrong about that. A. Yes.

"Q. And you did not say anything. A. No, sir.

"Q. Now, when Mr. Brooks started to pass the Ford car, did he turn sharply to the left or quite wide. A. Well, I could not tell you. He pulled over far enough to pass the Ford.

"Q. And he had room enough in the road to pass the Ford. Is that right. A. Well, he got by it; but, I would not have considered it room enough for me.

"Q. And in getting by he upset. A. Yes, sir.

"Q. Do you know whether or not the Ford car pulled to the left in front of Mr. Brooks as he was passing. A. No sir, I do not.

"Q. You could not say whether or not that was the fact then. A. No, sir.

"Q. As a matter of fact things happened pretty fast then, did they not. A. Yes, sir.

"Q. Can you tell me about the time it was, passing the Ford car until you again recollect to say what happened. A. Well, it just went across the road in front of the Ford car, hit the bank and tipped over on its side.

. . . . . . . . . . .

"Q. Now, up until the time that Mr. Brooks came up to the Ford, did you feel he was driving too fast. A. We had several arguments over it on the way, about how fast he was driving.

"Q. Did you object to the fastness of his driving. A. I never did; but he and I talked several times about the

speed he was driving, and he did not have the speedometer hooked up.

.   .   .   .   .   .   .   .   .   .   .

"Q. Did you consider the speed he was driving when he caught the Ford car, dangerous or excessive. A. Yes, excessive.

"Q. How long before he caught the Ford car, had you considered it excessive. A. I had three or four arguments about how fast he was driving.

"Q. But when you thought it was excessive you never did say a word to Mr. Brooks to slow down. A. Oh, no."

The same situation is disclosed by the testimony of Conley:

"A. Well, when we got down here to the road just east of Soldier eight or nine miles, we overtook a Ford car that had been up on the same stream. And there were four young people in the Ford coupe which was an old model. Mr. Brooks came up and started to go by; but, when we got within twenty feet of the Ford car, I told him they were pulling in towards us. I thought he would possibly slow down and pull in behind, but he pulled over and on around this Ford and it slid around and the next thing I knew we went in the ditch on the righthand side of the road and were headed back toward Hailey.

.   .   .   .   .   .   .   .   .   .   .

"Q. As Mr. Brooks was driving down the road did anyone make objection to the speed at which he was driving. A. Not that I heard.

"Q. And when Mr. Brooks caught up with the Ford car did he give any signal. A. I suppose he did, but I do not remember. The natural thing to do would be to give signals.

"Q. Did he give more than one signal. A. I have no recollection but I imagine he did.

"Q. As he started to pass the Ford car did it swerve to the right. A. It naturally came towards Brooks and I told Mr. Brooks 'I believe he is pulling over our way.'

"Q. Did he pull over. A. He swerved over our way.

"Q. What did Mr. Brooks then do. A. Pulled to the left and started around it.

"Q. Did he pull out suddenly to the left.  A. Yes, he did. He just started to turn.

"Q. And was that at the time you stated to him they were pulling in front of him.  A. Yes, I did.

"Q. Were you pretty badly excited.  Did you shout. A. I do not suppppose I did.

"Q. What is your recollection as to what you said.  A. My recollection is I said 'He is pulling over towards you.'

"Q. Was it in that tone of voice.  I could not tell you. I imagine I was talking pretty fast.

"Q. And the thing happened pretty fast.  A. It certainly did.

"Q. When Mr. Brooks turned to the left what then happened.  A. We felt the car going over, like it was going over the edge of the road, and then pulled across the road. It happened quickly.

.     .     .     .     .     .     .     .     .     .

"Q. Do you know what caused the Ford car to upset. (Continuing.)   I mean the Studebaker car to upset.  A. No, sir, I do not know.  I do not think anybody knows.  It is just a matter of everybody has his opinion as to what caused it.

"Q. Did the Studebaker car appear to skid at the rear. A. Yes, sir.

"Q. (Continuing.)   When you spoke to Mr. Brooks. A. No, sir; but shortly after that, when it started around, it seemed to skid.

"Q. How long after you spoke to him.  A. They were going so fast and so close there, it could not have been but just a few seconds.

"Q. You knew Mr. Brooks was going to pass the Ford car. A. I did not know he would.  I thought he would slow down and pull in behind it.

"Q. How fast was he going.  A. I do not know.  But when he went around he was going sixty miles an hour.

"Q. How fast had he been going just before that.  A. I do not know; but, a pretty fair rate of speed.

"Q. Was he driving the same as you had been driving in that trip. A. A little faster.

"Q. How much. A. I could not say.

. . . . . . . . . . .

"A. No, sir, I did not like the speed at which we were traveling.

"Q. How long before had he been traveling at that speed. A. Probably ten seconds.

"Q. Was that when he speeded up to pass the Ford, or not. A. Well, excited because it just looked like a wreck was inevitable.

"Q. How fast would you say he was going just before you spoke to him. A. I imagine about forty five to fifty miles.

. . . . . . . . . . .

"Q. You say that when this Studebaker car started around the Ford car you began to get excited. Now, that was about the time the Studebaker started turning out. A. Yes, sir.

"Q. What was there to excite you about that; the speed. A. The speed, yes, sir.

"Q. Then I believe you stated that about that time you told Mr. Brooks that the Ford was coming towards that side of the road. A. Yes, sir.

"Q. You stated in answer to cross examination that in your judgment an accident was inevitable. Now, just when did it become to you apparently inevitable that there would be an accident. A. When the rear end of the car started to skid or slide.

"Q. And what was it: the rate of speed or what, that made it appear to be inevitable. A. Well, I do not know. We were going fast, and the speed and the car slipping would naturally make it—

"Q. (Interrupting.) Certain that there would be an accident. A. Yes, sir."

Appellant saw and knew that respondent drew up as if to pass, but did not pass, and dropped back again. If the road was too narrow, and the speed of both cars too great

to attempt a safe passing appellant's own testimony shows that this situation was evident to him, since he testified he was apprehensive; and the jury was justified in concluding, if they believed respondent negligent in attempting to pass that appellant had had a timely opportunity to protest before the passing, and that his failure to do so showed consent to, and acquiescence in, respondent's attempt to pass the other car. We do not say that in law he was so guilty of contributory negligence as to bar a recovery, as held in *Dale v. Jaeger, supra,* but that such situation presented a question for the jury to reconcile and determine.

Appellant argues that "The danger was not apparent and it is not shown that there was anything that plaintiff could have done to avert the accident after the danger became known to him," which is somewhat inconsistent with the next sentence of his argument: "The duty of a passenger to remonstrate against excessive speed is dependent upon the circumstances."

The danger of passing because of the speed, narrowness of the road, and the possibility of the Ford turning to the left instead of maintaining its course, or turning to the right, was apparent to appellant when respondent first came up to pass, and then dropped back, because of what he was then observing, and because he had driven automobiles himself, and the jury was justified in the conclusion they may have reached, that there was time for appellant to have realized the situation, and protested or requested the driver not to attempt to pass the other car. Appellant could not have averted the accident in the sense that he physically or mechanically controlled the machine, but he could have indicated his dissent to the course of conduct being pursued by respondent, which would have been sufficient to relieve him from the charge of contributory negligence.

We do not say that the above critique of the phase of the evidence pertinent to appellant's argument is exclusive or the one followed by the jury, but it is reasonable, and justifies affirmance in the result arrived at by the jury.

Appellant stated that they had overtaken and passed at least one car earlier, and he felt they had been traveling too fast, but had not protested. (*Naglo v. Jones,* 115 Kan. 140, 222 Pac. 116.) Whether appellant had opportunity to timely or effectively protest, and whether his failure to do so evidenced his acquiescence in what respondent did, were questions peculiarly for the jury (Berry on Automobiles, sec. 665, and cases cited), and the instruction was not inept.

Requested instruction No. 9 does not state the law, and is contrary to the rule announced in *Dale v. Jaeger, supra.*

Requested instruction No. 10 was covered by instruction No. 6, as given.

Requested instruction No. 11, while perhaps proper was sufficiently covered in instruction No. 9, as given.

Requested instruction No. 12 differentiated as to the watchfulness required of a person in the rear seat, for one in the front seat. The gratuitous, or free passenger, wherever located in an automobile is under the duty of paying such attention to his own welfare, as a reasonably prudent person would do under like circumstances. This point was sufficiently covered in the second paragraph of instruction No. 9, as given, and the difference in relative opportunity or duty to observe and protest, as between the front or rear seat was herein not a question of law, but a question of fact that was properly left to the good judgment of the jury. (*Glanville v. Chicago R. I. & P. Ry. Co.,* 190 Iowa, 174, 180 N. W. 152.) Hence, the evidence in this case did not require the giving of requested instruction No. 12.

In *Dale v. Jaeger, supra,* the court held the negligence of the driver was so gross, and so apparent, that the guest, by not protesting, was guilty of contributory negligence, barring a recovery. If there is a question, as there is herein, as to whether in the first instance the driver is negligent, and second, whether the guest reasonably knew or should have known of the danger, and had reasonable time to effectively protest, or was prevented from protesting by some negligent act of the driver, such question should be left to the jury, as it was herein. If no contributory negligence could be reason-

ably inferred then it would not be a question for the jury. (*Jones v. Schrieber*, 166 Minn. 177, 207 N. W. 322; *Harding v. Jesse*, 189 Wis. 652, 207 N. W. 706.)

*Dowd v. Atlas Taxicab & Auto Service Co.*, 187 Cal. 523, 202 Pac. 870, cited by appellant, concerned a paying traveler, not a gratuitous guest. *Queirolo v. Pacific Gas & Elec. Co.*, (Cal. App.) 295 Pac. 882, and *Krause v. Rarity*, (Cal. App.) 285 Pac. 879, likewise cited by appellant, both sustain respondent's contention that the question of contributory negligence under facts somewhat similar, as to the principle involved in the case herein, is properly for the jury.

While the jury might have found otherwise than as they did, there is evidence to sustain the verdict, and the instructions as a whole fairly presented the issues as to the law, so no reversal is warranted.

Judgment affirmed; cost to respondents.

Lee, C. J., and Budge, Varian and McNaughton, JJ., concur.