J. K. Berk, administrator of estate of Jason Jon Berk, deceased, appellant, v. O. Arendts and Chicago & Rock Island Railroad Company, appellees.

Jason K. Berk, appellant, v. O. Arendts and Chicago & Rock Island Railroad Company, appellees.

No. 50630.

(Reported in 117 N.W.2d 905)

NOVEMBER 13, 1962.

Hobson & Cady, of Hampton, for appellant.

R. R. Stuart, of Hampton, and B. A. Webster, Jr., of Des Moines, for appellees.

SNELL, J.—Two actions for damages, consolidated for trial, resulted from a crossing collision between a two-ton pickup truck and defendants' train. Plaintiff's decedent, Jason Jon Berk, referred to in the record as "Jon", was killed. He was the driver of the truck. Plaintiff, Jason K. Berk, father of Jon and owner of the truck, was injured. Actions were brought against the railroad company and the train's engineer. Trial to a jury resulted in verdicts for defendants.

Although Jason K. Berk appears in the two actions in different capacities we will refer to him as plaintiff.

As errors relied on for reversal, plaintiff-appellant attacks the refusal of the trial court to submit certain specifications of negligence and to admit testimony offered by plaintiff. To the extent that the rejected testimony was offered in support of the refused specifications of negligence the problems are related. They will, however, be separately considered.

The Berks lived on a farm about one and three-quarter mile

from the scene of the accident. They were familiar with the railroad crossing and the road leading thereto.

About midmorning on December 22, 1959, Jason K. Berk and his son Jon left their farm home in a two-ton pickup truck to go to another farm to get some hay.

The weather was bad. It was raining and cold. The roads were very icy and slippery. In the words of the plaintiff they were driving on "just an ordinary gravelled road." The county engineer testifying for plaintiff classified the road as "just a local secondary road." At a stop sign at a road intersection a little distance from the scene of the accident the driver attempted to stop. Although he was going *"very slow"* at the time and *"the road was straight and level"* (emphasis supplied) he skidded 6 or 8 feet. The difficulty in controlling a vehicle on the icy road was obvious.

As they approached the railroad crossing the road was hilly. Plaintiff's vehicle was travelling east approaching the railroad crossing from the west. The road had a downgrade of 4.92 percent. The percentage of grade was well within the engineering standards in the community. The road crossed the tracks of defendant railroad company at the foot of the hill. The crossing was marked with the regulation signs required by statute. There was no automatic signal or flagman to indicate the approach of a train.

The railroad tracks run north and south. A southbound train approaches the crossing through a cut.

There is some dispute in the evidence as to sight distances from various points but according to plaintiff's evidence the cut begins about 150 feet north of the crossing and reaches a maximum of 15 to 20 feet in depth about 250 feet from the crossing. According to plaintiff when the truck was about 80 feet west of the crossing both driver and passenger saw the train about 250 feet north of the crossing.

From plaintiff's testimony we quote:

"Q. All right. When you first saw the train, did you say something? A. Yes.

"Q. What did you say? A. 'There's a train.'

"Q. What did Jon do? A. Started stopping, trying to stop; tried to apply the brakes and slid on the ice.

"Q. When he applied the brakes, what happened? A. Skidded all over the road.

"Q. Did he keep his brakes on? A. No; he put them on and off.

"Q. All right. Do you know whether or not he attempted to turn the vehicle? A. Yes. He just couldn't get the front end out of the road.

"Q. Did your speed decrease? A. Yes.

"Q. When you got to the railroad track, itself, how fast do you think you were going? A. Probably about five miles an hour.

"Q. Were you going to slide on across the track, or did it appear to you you were going to stop on—? A. It looked to me like we were going to stop right on the track.

"Q. Did you say anything then? A. Yes. I told the boy to step on it. He put it in second, and stepped on it.

"Q. Did it respond? A. Yes.

"Q. Where were you in relation to the track when the train hit you? A. Well, I must have been on the track. * * *

"Q. Mr. Berk, when Jon attempted to stop the truck, I think you have said it skidded or slid? A. Yes.

"Q. Was that on ice? A. Yes.

"Q. If there had been no ice, would he have been able to have stopped the truck? A. Yes."

The train struck the truck. Jon was killed and Jason injured. On the issues as submitted the jury found for defendants. We need not set out the evidence for defendants. We are concerned here with whether or not there was evidence, considered in its most favorable light, to support a refused specification of negligence. Rejected evidence will be considered infra.

I. Plaintiff pleaded and sought to have submitted specifications of negligence based on defendants' failure to provide a warning in the form of a brakeman at the crossing or an automatic signal to warn of the approach of a train. The Court did not submit these specifications to the jury and plaintiff claims error.

We have recently reviewed such a problem and extensive repetition and citation of authority is not necessary.

In Hammarmeister v. Illinois Central Railroad Co., 254 Iowa 253, 257, 117 N.W.2d 463, 465, we said:

"The question of the duty and liability of a railroad company when it transverses country highways or city or town streets is as old as the history of railroading in Iowa. Throughout many years the general principle adopted by our courts has been the same. As to the requirement of installing automatic crossing bells or other signals warning of the approach of a train, the rule has always been, and is now, that to justify such equipment the crossing must be more than ordinarily dangerous. It is only where the ordinary statutory signals are insufficient that additional warning is required."

In the same case we quote with approval from Glanville v. Chicago, Rock Island & Pacific Railway Co., 190 Iowa 174, 181, 182, 180 N.W. 152, 155, as follows:

"The law seems to be fully settled that a railway company is required to station a flagman or install electric or other signaling devices only when, owing to its situation, surroundings, or use, the crossing is more than ordinarily dangerous; so dangerous and of a character such that other than statutory warnings are essential to the reasonable protection of travelers on the highway, about to cross the railroad tracks."

Other recent cases considering crossing signals are Rosin v. Northwestern States Portland Cement Co., 252 Iowa 564, 107 N.W.2d 559; and Wickman v. Illinois Central Railroad Co., 253 Iowa 912, 114 N.W.2d 627.

Except for some distinguishing features hereinafter noted the Wickman case, supra, has much in common with the case now before us. In that case there were obstructions to vision and limited sight distance as here. In the cited case, however, the road was a farm-to-market road with heavy traffic. Here we have a local secondary road with limited traffic. In the cited case there was no evidence as to the actual speed of the truck; no evidence as to what actually happened, except that the truck driver was hit by a train at what plaintiff's witnesses described as a blind crossing on a heavily travelled road.

In the case at bar the view of an approaching train is limited but neither the testimony nor the exhibits support a claim that it is a blind crossing.

Here we have positive evidence from plaintiff himself that he and his son knew the contour of the land, the crossing and the road conditions. They saw the train coming. Except for the ice on the road they could have stopped in time. Plaintiff said so. They skidded into the train's pathway. They could not stop in time, not because of any extraordinary hazard at the crossing, but because of an extraordinarily slippery road. These facts, of course, relate more to the problem of proximate cause than to negligence. Proximate cause is ordinarily for the jury. Here, however, the facts leave plaintiff with nothing upon which to base an allegation that the crossing was more than ordinarily hazardous. The facts would not support a verdict based on such claimed negligence as a proximate cause of the accident. Barrett v. United States Railroad Administration, 196 Iowa 1143, 1148, 194 N.W. 222; and Pifer v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co., 215 Iowa 1258, 247 N.W. 625.

We quote excerpts from the Wickman case, supra:

"Some principles are well settled. One is that a railroad company is not required to install a signaling device or station a flagman at every railway crossing. Glanville v. Chicago, R. I. & P. R. Co., 190 Iowa 174, 180, 180 N.W. 152, 155. Another holds that the statutory requirements for warnings at railway crossings, as the crossbucks, ringing the bell and blowing the whistle are minimum only; and that conditions may exist which require more." (Citations)

"A third principle, elementary of course, is that in this class of cases our duty is not to decide whether the crossing in question was in fact extraordinarily hazardous so that some warning beyond the statutory requirements was called for, but only to say whether there was substantial evidence from which a jury might so find." (Citations)

" 'There must be something in the configuration of the land, or in the construction of the railroad, or in the structures in the vicinity, or in the nature or amount of the travel on the highway, or in other conditions, which renders the ringing the bell and

sounding the whistle inadequate properly to warn the public of danger.'" (Citation)

"'* * * before a jury will be warranted in saying, in the absence of any statutory direction to that effect, that a railroad company should keep a flagman or gates at a crossing, it must be first shown that such crossing is more than ordinarily hazardous; as, for instance, that it is in a thickly populated portion of a town or city; or that the view of the track is obstructed, either by the company itself or by other objects proper in themselves; or that the crossing is a much traveled one, and the noise of approaching trains is rendered indistinct, and the ordinary signals difficult to be heard, by reason of bustle and confusion incident to railway or other business, or by reason of some such like cause; * * *.'" (Citations)

In ruling on plaintiff's motion for new trial the trial court carefully reviewed the evidence and said:

"The evidence produced was to the effect that this was a rural crossing; that the road was a little used country road; that in a 24-hour period but few trains passed over the crossing; that the road west of the crossing was level for 80 feet, after which it ascended a hill; that the view of a person approaching the crossing from the west is obstructed to some extent to the north by the presence of some high ground, but that a person on the road when about 125 feet west of the crossing can see a train on the track more than 200 feet north of the crossing and that when about 75 feet west of the crossing, the distance at which a train can be seen north of the crossing is 600 feet or more.

"The presence of snow on the ground did not create a hazard because Mr. Berk testified that he saw the train when the truck in which he and the decedent were riding was 75 or 80 feet west of the crossing.

"In view of all of this evidence it is the opinion of the Court that reasonable minds could not differ in reaching the conclusion that the crossing here involved was an ordinary rural crossing, that it was not unusually dangerous or hazardous, and that it would have been error to have submitted the grounds of negligence" relative thereto.

We agree.

II. Plaintiff claims error in the court's refusal to admit certain testimony in support of plaintiff's claim of more than ordinarily dangerous conditions.

Plaintiff offered to prove by the records of the County Official Weather Observer the average number of days for the months of October through March during which the temperature is 32° or less. The offer did not include any showing as to how often there was ice on the road or crossing. The evidence was excluded as too remote. The court commented that plaintiff might show the frequency of ice on the crossing and approach but that temperature alone was too remote to show slippery conditions. The trial court was right.

As this opinion is being written the outdoor temperature is below 32° but the streets and highways are as dry and safe as any day in midsummer. In the case at bar evidence as to how often the temperature might be below 32° was too remote. The evidence was not connected with evidence of other physical elements such as frequency or amount of precipitation, the duration of conditions or anything else.

III. To prove that the crossing was more than ordinarily dangerous plaintiff offered testimony of other claimed accidents or near accidents.

It is well settled in Iowa that evidence of prior accidents and near accidents is admissible to show the dangerous character of a crossing. See Plumb v. The Minneapolis and St. Louis Railway Co., 249 Iowa 1187, 1197, 91 N.W.2d 380, and authorities cited therein. However, it must appear that conditions were comparable and not too remote. Lindquist v. Des Moines Union Railway Co., 239 Iowa 356, 367, 30 N.W.2d 120, citing 38 Am. Jur., Negligence, section 314.

The weakness in plaintiff's position is not in the law but in the evidence. Plaintiff called four witnesses to show accidents or near accidents.

James Gatliff, 14 or 15 years ago, approached the crossing with an old slow-moving tractor pulling a disc on a stoneboat. He stopped 25 or 30 feet from the crossing, looked, saw nothing, and started across. It took him two and one-half minutes to cross the

track. He failed by four or five or six inches. A train came and hit the rear end of the stoneboat. He filed no claim for his damage. The fact that 14 or 15 years ago the rear end of a stoneboat loaded with a disc and pulled by a slow-moving tractor was hit by a train proves nothing as to the dangerous character of the crossing.

Burl Ratcliff has lived in the neighborhood for 18 years. He farms land on both sides of the track. He crosses the tracks at the crossing from four times a day to 30 or 40 times a day when hauling grain or hay. About five years ago he came to about 10 feet from the track, "through force of habit" stopped and *then* (emphasis supplied) looked north and saw a train 50 feet away. Nothing happened. To stop, look and see a train on a railroad track is neither an accident nor a near accident. The only accident he can recall in 19 years was when a manure spreader that had come loose from the tractor and was sitting on the track was hit by a train. The fact that an implement, disengaged from any motive power and stalled on the track, was hit proves nothing except that the implement was in the way of the train.

The witness also testified that the road does not get covered with ice any more than any other road.

Nothing in his testimony would support a jury finding of more than ordinary danger.

Mrs. Esther Cormaney, between the date of plaintiff's accident and time of trial, approached the crossing from the west. When about two thirds of the way down the hill she saw a train coming. She applied her brakes and stopped about two car lengths from the crossing. The fact that a motorist in the ordinary course of driving stops to let a train pass is no proof at all that the crossing is more than ordinarily dangerous.

Claude Oleson, a farm employee and part-time butcher, used the road frequently. About a year after plaintiff's accident Mr. Oleson approached the crossing from the east. His direction was the opposite of plaintiff's. When about 75 feet from the track he saw a train. He applied his brakes, skidded his tires and stopped about three feet from the track. The approach to the crossing was not the same. The testimony proved nothing.

From these four witnesses it appears that in 18 years the

end of a slow-moving stoneboat and a stalled manure spreader were hit and two people had to stop (one rather hurriedly) for a passing train. There was no evidence that in all that time anyone, except plaintiff's decedent and plaintiff, were ever hurt and no ordinary moving vehicle was ever hit by a train.

The trial court struck from the record that part of the testimony of these four witnesses relating to near accidents. The trial court was right. There was nothing therein that would support a jury finding that the crossing was more than ordinarily dangerous.

IV. We are not unmindful of the rule that if there is anything in the evidence upon which a jury might base a finding of negligence the issue should be submitted. Our cases also show that we are loath to interfere with a jury verdict for a plaintiff where there is evidence upon which reasonable minds might differ. In the instant case, however, reasonable minds could not conclude from all the evidence, including that stricken, that defendant railroad company was negligent in failing to have a flagman or automatic signals at the crossing or that the accident resulted from such failure.

The case was submitted to and decided by a jury upon all the issues upon which plaintiff made out a jury question. We cannot open the door to verdicts based on remoteness, speculation or immaterial incidents of no probative value.

We find no error.

The case is—Affirmed.

All JUSTICES concur except STUART, J., who takes no part.