Mabel KUPER, Administratrix of the Estate of Kenneth Lee Kuper, Deceased; Russell Kuper; and Kroblin Refrigerated Express, an Iowa Corporation, Appellees,

v.

CHICAGO AND NORTH WESTERN TRANSPORTATION COMPANY, Appellant.

No. 62776.

Supreme Court of Iowa.

April 23, 1980.

Rehearing Denied May 16, 1980.

B. A. Webster and Bruce E. Johnson of Gamble, Riepe, Burt, Webster & Davis, Des Moines, for appellant.

Nick Critelli of Critelli & Foxhoven, Des Moines, for appellees.

Considered by REYNOLDSON, C. J., and LeGRAND, REES, UHLENHOPP, and McGIVERIN, JJ.

LeGRAND, Justice.

This appeal arises out of an accident which occurred on March 19, 1976, when a semitrailer struck a standing train of the Chicago and North Western Transportation Company. The accident caused the death of Kenneth Lee Kuper, and the principal plaintiff is the administrator of his estate.

At the time of the accident, the decedent was driving a rig partially owned by Russell Kuper and partially owned by Kroblin Refrigerated Express. Jury verdicts were returned for the decedent's estate for $150,-000.00; for Russell Kuper in the sum of $16,500.00; and for Kroblin Refrigerated Express in the amount of $27,943.59. Judgment was subsequently entered on these verdicts and North Western appeals. We reverse and remand for a new trial.

The following errors are urged as grounds for reversal:

1) Permitting the jury to decide if the railroad crossing was extra hazardous so as to require warnings other than those prescribed by statute.
2) Error in instruction on extra hazardous crossing.
3) Refusal to hold decedent guilty of contributory negligence as a matter of law.
4) Errors in ruling on evidence.
5) Submitting issue of punitive damages to the jury.
6) Allowing interest from the date of the accident rather than the date of the judgments.
7) Allowing improper and prejudicial final argument to the jury.

We postpone a detailed description of the facts until discussing the specific questions to which they relate. We recite now only a few background circumstances to afford a better understanding of the issues involved.

The accident occurred at the 112th Street crossing in Polk County. The crossing sits in what was described by several witnesses as a depression or valley. The decedent was coming from the south on 112th Street, a blacktop county road. After coming over a slight rise, the approach is straight and level for at least 1,000 ft. before reaching the tracks.

The train consisted of seventy-eight cars. It was almost a mile long. Approximately a quarter of a mile east of 112th Street, the engineer faced a stop-and-go signal. This is an electrical signal which directs an engineer to stop and then proceed cautiously. When the train was brought to a stop, the twenty-fourth car was blocking the crossing. Estimates of the length of time the train had been stopped prior to the accident varied, but it was quite short in any event. The force of the impact derailed the car, destroyed both the tractor and trailer, and caused fatal injuries to Kenneth Lee Kuper. There were no witnesses.

## I. *Extra Hazardous Nature of Crossing.*

The most hotly contested issue throughout this entire case was whether the 112th Street crossing is so dangerous or extra hazardous that North Western should have given warnings in addition to those prescribed by section 327G.2, The Code 1977.

The evidence shows there was a round yellow sign displaying a large "X" together with the letters "RR" located approximately 800 ft. from the crossing. There was also a large "X" with the letters "RR" painted on the surface of the road approximately 325 ft. from the tracks. It is not contended that these did not satisfy the statutory provision as to warning but it is argued instead that the crossing was extra hazardous and that it demanded warnings or signals in addition to these.

The statute involved is section 327G.2, The Code, which we here set out:

Crossings—signs. Every corporation constructing or operating a railway shall make and construct at all points where such railway crosses any public road good, sufficient, and safe crossings and erect at such points, at a sufficient elevation from such roads as to admit [a] free passage of vehicles of every kind, a sign with large and distinct letters placed thereon, to give notice of the proximity of the railway, and warn persons of the necessity of looking out for trains. Any railway company neglecting or refusing to comply with the provisions of this section shall be liable for all damages sustained by reason of such refusal or neglect, and it shall only be necessary, in order to recover, for the injured party to prove such neglect or refusal.

Under our cases this statute sets up minimum standards only. Although a railroad company is not required to install additional signalling devices at every crossing, it must do so whenever a crossing is deemed extra hazardous. Whether it is extra hazardous is a jury question unless the evidence is so strong that reasonable minds could reach but one conclusion. It then became a question of law for the court. *Gant v. Chicago & North Western Railway Company,* 434 F.2d 1255, 1258 (8th Cir. 1970); *Maier v. Illinois Central Railroad Company,* 234 N.W.2d 388, 391 (Iowa 1975); *Wickman v. Illinois Central Railroad Company,* 253 Iowa 912, 917, 114 N.W.2d 627, 630 (1962); *Plumb v. Minneapolis & St. Louis Railway Company,* 249 Iowa 1187, 1196, 91 N.W.2d 380, 386 (1958); *Russell v. Chicago, Rock Island & Pacific Railroad Company,* 249 Iowa 664, 668, 86 N.W.2d 843, 845–46 (1957); *Strom v. Des Moines & Central Iowa Railway Company,* 248 Iowa 1052, 1068–69, 82 N.W.2d 781, 790–91 (1957); *Lindquist v. Des Moines Union Railway Company,* 239 Iowa 356, 360, 30 N.W.2d 120, 122 (1947); *Glanville v. Chicago, Rock Island, & Pacific Railway Company,* 190 Iowa 174, 181, 180 N.W. 152, 155 (1920); see also *Wiedenfeld v. Chicago & North Western Transportation Company,* 252 N.W.2d 691, 700 (Iowa 1977).

We have said that precedents in these cases are of little value and that each case must be decided on a consideration of all the surrounding circumstances applied to conditions existing at the time of the acci-

dent. *Strom*, 248 Iowa at 1062, 82 N.W.2d at 787.

The question facing us now is whether the record discloses substantial evidence upon which the jury, as reasonable persons, could find the 112th Street crossing to be extra hazardous. The question is close, and we view the evidence in the light most favorable to plaintiff. We cannot say there is no reasonable basis for holding as the trial court did. Hence we conclude it was not error to submit this issue to the jury.

We mention parenthetically that the Sixty-Seventh General Assembly in 1977, ch. 103, section 2, amended section 307.26, The Code, to fix statutory guidelines for identifying dangerous railroad crossings. This amendment now appears in section 307.-26(5)(b), The Code 1979. It provides among other things that a "railroad crossing shall not be found to be particularly hazardous for any purpose unless the department [of Transportation] has determined it to be particularly hazardous." That amendment, however, was enacted subsequent to this accident. When the events here in question occurred, the North Western had an independent duty to determine which crossings were extra hazardous and to take proper steps for the safety of those using the highways. *Symmonds v. Chicago, Milwaukee, St. Paul & Pacific Railroad Company*, 242 N.W.2d 262, 265–66 (Iowa 1976).

We have already given a brief outline of the facts. We supplement that now by a more detailed recitation of the evidence relating to this issue.

On the night of the accident, the weather was clear, the road was dry, and driving conditions were good. There is no artificial light at the crossing. There was little natural light. Five witnesses for plaintiff described this crossing as extremely dangerous. They used such terms as "killer crossing" and "pit of darkness" in supporting their opinions. As early as 1972, Sister Mary Elizabeth Gannon, one of plaintiff's witnesses, wrote the president of North Western about the dangerous nature of several crossings, including this one. The company sent an investigator to survey the crossing in company with Sister Mary Elizabeth Gannon. However, nothing was done at this time.

She testified she used this road frequently, and that it was impossible to see a train stopped at the crossing. She also testified it was impossible to see a train to the east or right as one approached from the south because of a dike formed by dirt from a drainage ditch.

A highway patrolman, Mike Metzger, testified he gave notice to North Western about the dangerous nature of this crossing in 1975. He also met with a representative of the railroad. Again, no action was taken. Metzger testified concerning his familiarity with the railroad crossings in Polk County. He testified he had never "seen one as bad as this for nighttime visibility." He said this was "because of the surroundings, the dug out ditch or bank, whatever you want to call it, on the east side of the road."

Another witness, Kenneth McCammant, who is a truck driver, testified as follows:

Q. Mr. McCammant, have you had a chance to drive this highway at this crossing from the south going north at night under the same conditions that you've indicated before.

A. Yes, sir.

Q. Can you tell us a little bit or describe the visibility at this crossing if there is a train on that track?

A. You come down off of that [incline] and you cannot see the train.

Q. Okay. Do you know why?

A. I've had occasion to drive it a lot of times. I've hauled seed corn up through there and had to make many trips up through there in the early morning and night, and I don't know it is just like when you go down in there it is just like you're going down in a pit. I don't know. It is—there is just—don't seem like there is any light down there or everything is just kind of comes together. It is the only thing I can describe. It is

you're going into a pit and there's just nothing there.

Q. Have you had an occasion to drive that with your semi?

A. Yes, sir.

Q. And what is the situation in your semi relative to visibility of trains on that crossing at night going from the same direction?

A. I made some tests for one of the inspectors and I've made several on my own, and you'd have to be, I would say, really alert if there is a train sitting across the track to see it. I mean, you'd have to know it was there to see it.

. . . . .

You could never go down there and be a stranger in the area and know it was there.

. . . . .

If you was a stranger in the area coming down there and coming up the tracks, if there was a train sitting there, you would never know it was there.

In addition, there is a letter from the Iowa Department of Transportation to the North Western Railroad early in 1976 designating this crossing as sixth among twenty-one which were scheduled for installation of electronic signals in Polk County.

Furthermore, Delbert Cherveny, manager of signals and communications for North Western, examined this crossing just one day before the accident and later reported that a signal should be installed there. As a matter of fact he recommended that it be given greater priority than had been given by the Department of Transportation. While, of course, signals could not have been installed between the time of his inspection and the time of the accident, nevertheless his recommendation related to conditions existing long prior to that time.

We have not ignored the strong evidence produced by North Western to show that this crossing was no more dangerous than the ordinary railroad crossing in this state. The approach was straight and level, visibil-ity was (according to defendant's witnesses) unimpeded in both directions, and the standing railroad cars, according to tests run, were clearly visible for at least 350 ft. under normal headlight use. There were also a number of photographs introduced as exhibits which support this view.

We have given all of this evidence careful consideration. We cannot say that reasonable minds, under this record, could reach only the conclusion that this crossing was not extra hazardous. We therefore hold the issue was properly given to the jury.

II. *Instruction on Extra Hazardous Crossing.*

█ In the instruction on what constitutes an extra hazardous crossing—the vital issue in the case—the court included a statement that the jury could consider whether or not the railroad cars were reflectorized. We set out part of the instruction:

The Defendant railroad was under no duty to place reflectors, reflectorized paint, or other reflectorized or bright material on the side of its boxcars, and failure to do so, in and of itself, does not constitute negligence on its part, *but such an absence may be taken into consideration together with all the facts as shown by the evidence in determining whether the crossing was more than ordinarily dangerous.*

(Emphasis added).

We believe this was error. Whether or not a crossing is extra hazardous depends upon its physical characteristics and conditions relating to the crossing itself. This includes anything which would obstruct visibility, heavy traffic which would pose an unusual problem, or similar circumstances. We find no authority, and none has been pointed out, which suggests the condition of a particular train renders an otherwise safe crossing unusually hazardous. As used in this context "extra hazardous" does not depend on the type of railroad equipment using the tracks at a given moment. While that would bear on the railroad's general

negligence, it would not change a safe crossing into a dangerous one.

The following from *Glanville v. Chicago, Rock Island & Pacific Railroad Company*, 190 Iowa at 181, 180 N.W. at 155, bears somewhat on this matter:

> There must be something in the configuration of the land, or in the construction of the railroad, or in the structures in the vicinity, or in the nature or amount of the travel on the highway, or in other conditions, which renders the ringing the bell and the sounding the whistle inadequate properly to warn the public of danger.

*See also Berk v. Arendts*, 254 Iowa 363, 369, 117 N.W.2d 905, 907 (1962).

The instruction as given reversed the principles which should govern. If the jury first finds the crossing is extra hazardous, then the absence of reflectorized material or other safeguards might constitute negligence but this is only because the crossing *is* extra hazardous. The absence of such warnings does not make it so.

■ In other words, whether a crossing is extra hazardous must be determined on factors relating to the crossing, not to the equipment which uses it.

Support for this is found in *Gant v. Chicago & North Western Railway Company*, 434 F.2d at 1260–61 where the court said this:

> While not specifically raised, there is an inference in appellant's argument that the crossing here involved was extraordinarily hazardous because of the length of the train. . . . [I]t is . . . clear that a crossing is not to be considered hazardous one day and not hazardous the next, based solely upon the length of the train using the crossing. . . . The length of the train was not claimed as a ground of negligence. Its presence on the crossing was in no manner illegal. Again, neither the Iowa Legislature nor the Iowa court has ever considered the length of a train in listing conditions which would make a crossing extraordinarily hazardous. We will not do so here.

This same rationale applies to the condition of the cars in the present case. The erroneous instruction permitted the jury to find this crossing extra hazardous based upon a factor which should not have been considered, and this requires reversal for a new trial.

## III. *Contributory Negligence as a Matter of Law.*

North Western argues that decedent Kuper was guilty of contributory negligence as a matter of law in driving his equipment into a standing railroad car and that the trial court should have directed a verdict on that ground.

Again there is strong evidence of negligence on Kuper's part. A resolution of this question, however, depends to some extent upon the same testimony we have set out in Division I. If the jury found that the crossing was extra hazardous and that visibility was virtually nonexistent and that the North Western should have had some additional warnings or signals, then it could also find that Kuper was not guilty of contributory negligence.

■ Contributory negligence is ordinarily an issue for the jury. North Western argues this is one of the exceptional cases justifying a departure from that rule. Without again analyzing the evidence, we hold that the issue was properly for the jury. *See Paulsen v. Des Moines Union Railway Company*, 262 N.W.2d 592, 596 (Iowa 1978); *Maier v. Illinois Central Railroad Company*, 234 N.W.2d at 393; Iowa R.App.P. 14(f)(10).

## IV. *Objections to Rulings on Evidence.*

Defendant challenges two rulings by the trial court on the admission of evidence. The most serious deals with testimony relating to prior accidents. Before reaching that issue, we discuss briefly the other claimed error concerning the admission of a post-accident letter from the Department of Transportation to North Western. This letter asked the railroad to reply to a pre-accident letter about this and other Polk Coun-

ty crossings. Defendant says it was error to admit this letter under the rule which excludes evidence of post-accident repairs or alterations.

In the present case this letter did no more than corroborate evidence which was already in the record without objection. Its admission was without prejudice and affords defendant no basis for complaint.

Evidence of two prior accidents at this crossing was admitted over objection that they occurred under circumstances dissimilar to those in the present case. We hold this was error.

Since *Lindquist v. Des Moines Union Railway Company*, 239 Iowa at 368, 30 N.W.2d at 126, we have permitted evidence of prior accidents, not to show negligence, but to show the existence of a dangerous condition and notice. It must appear the prior accidents occurred under substantially similar circumstances.

In *Lindquist*, 239 Iowa at 368, 30 N.W.2d at 126, we said:

While the weight and credibility of such evidence is for the trier of fact, it would appear that it is relevant to the issue involved, (*the existence of a hazardous condition and notice thereof to the defendant*). That by the great weight of authority and based upon sound principle, such evidence is admissible as an abstract proposition.

(Emphasis added).

In a later case, *Berk v. Arendts*, 254 Iowa at 370, 117 N.W.2d at 909, we added this:

It is well settled in Iowa that evidence of prior accidents and near accidents is admissible *to show the dangerous character of a crossing*. [Citations omitted]. However, it must appear that conditions were comparable and not too remote. [Citations omitted].

(Emphasis added).

One of the prior accidents involved here occurred in the daytime between a moving train and a moving car. In the present case we have an accident at night involving a stopped train. The other happened at night when visibility was hampered by fog. The accident now before us occurred on a clear night.

The only similarity in circumstances (and the one the trial court relied on) is that the two prior accidents occurred while the vehicles were approaching the crossing from the same direction as the decedent. We do not believe this meets the test of *Lindquist* and *Berk*. Conditions were so dissimilar that the evidence should not have been received. On retrial it should be excluded.

V. *Punitive Damages.*

This presents a novel question. The issue of punitive damages was submitted over defendant's strenuous objections. The jury returned a verdict for compensatory damages but denied the claim for punitive damages. Thus defendant is appealing on a matter in which it prevailed at trial. Ordinarily a successful party cannot appeal. *White v. Citizens National Bank of Boone*, 262 N.W.2d 812, 814–15 (Iowa 1978); *Benson v. Chase Grain Storage Company*, 246 Iowa 591, 600, 67 N.W.2d 433, 438 (1955); *Security Savings Bank v. Smith*, 144 Iowa 203, 211, 122 N.W. 825, 828 (1909); *Meyer v. Baird*, 120 Iowa 597, 600, 94 N.W. 1129, 1131 (1903).

Defendant, however, insists it was prejudiced because submitting punitive damages provided the jury with a bargaining tool by which it could persuade reluctant jurors to hold against defendant on liability by agreeing to disallow the punitive damage claim. No authority is cited for this theory. It is purely speculative and without merit.

We would disregard this assignment of error except for the fact it will certainly arise again on retrial. While the record may be different when the case is tried anew and while we do not intend to bind the trial court as to what may occur then, we believe the issue was properly submitted.

We have discussed punitive damages in a number of cases recently. We need not repeat the governing principles here. *See Feeney v. Scott County, Iowa and City of*

Davenport, Iowa, 290 N.W.2d 885, 892 (Iowa 1980); Meyer v. Nottger, 241 N.W.2d 911, 922 (Iowa 1976); Giltner v. Stark, 219 N.W.2d 700, 708 (Iowa 1974); Northrup v. Miles Homes, Inc. of Iowa, 204 N.W.2d 850, 859 (Iowa 1973); Sebastian v. Wood, 246 Iowa 94, 101, 66 N.W.2d 841, 844 (1954).

Plaintiffs presented evidence from which the jury could have found defendant was advised several years before the accident—repeatedly—of the dangerous condition of the crossing; that it ignored attempts to accelerate the installation of additional signals; that its own employees recommended the crossing to be signalized; that the crossing was scheduled for additional signals; and that installation of signals was unreasonably delayed to await the allocation of federal funds.

There was opposing evidence designed to show defendant's diligence in inspection and investigation of complaints; the lengthy delays inevitable from planning to installation; the responsibility of governmental agencies for initiating procedures for additional signals; and the fact the crossing did not require additional signals anyway.

■ We hold there was a jury question as to whether defendant's conduct indicated such a disregard for the safety of the public that punitive damages should be assessed.

We repeat we are talking only about *this* record. In the event of a new trial, the trial court must, of course, decide if a jury question is generated on the evidence before it at that time.

VI. *Interest.*

Defendant asserts the trial court erred in assessing interest from the date of death rather than from the date of the verdict. In view of our reversal for a new trial, this matter might be ignored. However, it will probably arise upon retrial.

There were three separate judgments. Two were for property damage in stipulated amounts for destruction of the tractor and trailer. It was also stipulated these were total losses. The third judgment was for the wrongful death of Kenneth Kuper.

■ Under our decisions the two judgments for property damage were for liquidated damages. Interest was properly allowable from the date of the accident. *See Lemrick v. Grinnell Mutual Reinsurance Company,* 263 N.W.2d 714, 720 (Iowa 1978); *General Mills, Inc. v. Prall,* 244 Iowa 218, 221, 56 N.W.2d 596, 598 (1953); *Carter v. Marshall Oil Company,* 185 Iowa 416, 421–22, 170 N.W. 798, 800 (1919); Note, *Wrongful Death Damages in Iowa,* 48 Iowa L.Rev. 666, 690–91 (1963).

■ The circumstances are different as to the death claim. Whether interest is allowable from the date of death or from the date of verdict depends upon the instruction as to how damages should be computed. If loss to the decedent's estate is computed as of the date of the verdict (as it was here), then interest is allowable only from that time. This is explained in *Abel v. Dodge,* 261 Iowa 1, 10–12, 152 N.W.2d 823, 828–29 (1967). Incidentally the instruction in this case was the same as the one given in *Abel.* On retrial the principles announced in that case should be followed.

■ Plaintiff insists defendant has waived any objections to the assessment of interest. We do not pass on that question. We point out, too, the petition asks interest only from the date of judgment. In no event would plaintiffs be entitled to more than they asked. *Bosch v. Garcia,* 286 N.W.2d 26, 27 (Iowa 1979); *Laverty v. Hawkeye Security Insurance Company,* 258 Iowa 717, 727, 140 N.W.2d 83, 89 (1966).

VII. *Final Argument to the Jury.*

Defendant asserts the trial court erred in permitting plaintiffs' counsel, over proper objection, to argue matters outside the record. This involved a "recognition time" factor which counsel used in estimating the time and distance it would have taken to stop decedent's tractor-trailer.

■ We believe counsel did no more than make certain computations which the jurors could have made for themselves from

the facts in evidence. *See Wiedenfeld v. Chicago and North Western Transportation Company*, 252 N.W.2d 691, 700 (Iowa 1977). In any event counsel, now forewarned, will probably make more certain on retrial that the record supports the argument.

VIII. *Conclusion.*

There was reversible error for the reasons stated in Divisions II and IV. The judgments are reversed and remanded for a new trial.

REVERSED AND REMANDED.