Nancy A. **BAKHUYZEN**, Personal Representative of the Estate of Nicholas A. Bakhuyzen, Plaintiff,

v.

**NATIONAL RAIL PASSENGER CORPORATION, et al.,**
Defendants.

Mamie **DAVIS**, Plaintiff,

v.

**NATIONAL RAILROAD PASSENGER CORPORATION, et al.,**
Defendants.

James W. **CHILES**, Plaintiff,

v.

**NATIONAL RAILROAD PASSENGER CORPORATION, et al.,**
Defendants.

**NATIONAL RAILROAD PASSENGER CORPORATION, Plaintiff,**

v.

**VAN ANDEL, INC., et al., Defendants.**

Nos. 1:94–CV–264, 1:94–CV–281, 1:94–CV–607 and 1:95–CV–106.

United States District Court,
W.D. Michigan,
Southern Division.

Feb. 6, 1996.

Douglas A. Merrow, Chambers, Steiner, PC, Kalamazoo, MI, for Nancy A. Bakhuyzen, Nicholas A. Bakhuyzen.

Mary C. O'Donnell, Hopkins & Sutter, Troy, MI, for National Railroad Passenger, Corp., Consolidated Rail Corp.

James L. Wernstrom, Law, Weathers & Richardson, Grand Rapids, MI, for James W. Chiles.

Daniel K. Jamieson, Ryan, Jamieson & Morris, Kalamazoo, MI, Robert C. Engels, Reed, Stover & O'Connor, PC, Kalamazoo, MI, for Balkema Sand & Gravel, Inc.

Daniel K. Jamieson, Ryan, Jamieson & Morris, Kalamazoo, MI, for Henry Balkema, Josephine G. Balkema.

Paul B. Hines, Galbraith & Booms, Southfield, MI, James R. Hulbert, Henry L. Guikema, PC, Grand Rapids, MI, for Van Andel, Inc., Lambert Van Andel, Van Andel Propane, Van Andel Propane Kalamazoo, Inc., Van Andel LP Gas, Van Andel Propane of Michigan.

Jon J. Schrotenboer, Nelson & Kreuger, PC, Grand Rapids, MI, for John Scholten.

### OPINION ON AMTRAK AND CHILES' MOTIONS FOR SUMMARY JUDGMENT AS TO BAKHUYZEN AND DAVIS

ROBERT HOLMES BELL, District Judge.

These consolidated lawsuits arise out of a collision on March 10, 1993, between a truck carrying liquid propane and a National Railroad Passenger Corporation ("Amtrak") train. This matter is currently before the Court on a motion for summary judgment filed by Amtrak against Nancy Bakhuyzen and Mamie Davis, the plaintiffs in Case Nos. 1:94–CV–264 and 1:94–CV–281. James Chiles has joined in Amtrak's motion.

At the time of the accident Nicholas Bakhuyzen was driving a truck owned by his employer, Van Andel L.P. Gas. He was traveling south on a private grade crossing which intersects with the railroad tracks and M–96 at milepost 139.0. Bakhuyzen was struck by an Amtrak train traveling at approximately 60 miles per hour.

Nancy Bakhuyzen (personal representative of the estate of Nicholas Bakhuyzen) and Mamie Davis (a passenger on the Amtrak train) filed actions against Amtrak and Chiles, alleging that Chiles, the train engineer, was negligent in the following respects:

a. Operating the passenger train at a speed too fast for conditions;

b. Failing to operate the train in a careful and prudent manner;

c. Failing to keep a proper lookout for vehicular traffic crossing in the path of the train;

d. Failing to give adequate warnings of the train's approach; and

e. Failing to brake in time to avoid the collision.

Bakhuyzen and Davis have further alleged that Amtrak is vicariously liable for the actions of Chiles because Chiles was Amtrak's agent and was acting in the scope of his employment at the time of the accident.

Amtrak and Chiles contend they are entitled to judgment in their favor as a matter of law as to each of these allegations of negligence.

### I.

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. In evaluating a motion for summary judgment the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). If the movants carry their burden of showing there is an absence of evidence to support a claim then the non-moving parties must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Inferences to be drawn from the underlying facts must be viewed in the light most favorable to the parties opposing the motion. *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348. Nevertheless, the non-moving parties must do more than simply show that there is some metaphysical doubt as to the material facts. *Id.* at 586, 106 S.Ct. 1348. The mere existence of a scintilla of evidence

in support of the non-moving parties, position is not sufficient to create a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The proper inquiry is whether the evidence is such that a reasonable jury could return a verdict for the parties opposing the motion. *Id. See generally, Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476–80 (6th Cir.1989).

## II.

Bakhuyzen and Davis are willing to stipulate to the entry of summary judgment with respect to the fifth allegation, i.e., that Chiles was negligent in failing to brake in time to avoid the collision. They contend, however, that there are issues of fact and law that prevent entry of judgment on the first four allegations of negligence.

### A. Train Speed

The first allegation of negligence is that the train was traveling too fast for conditions. Bakhuyzen and Davis do not dispute the fact that the train was traveling 58 to 60 miles per hour at the time of the accident. They concede that the train speed was within the FRA maximum track speed, although they disagree what the track speed was at the site of the accident.[1]

The Federal Railroad Safety Act of 1970 ("FRSA"), 45 U.S.C. §§ 421–447 (repealed July 5, 1994), was enacted "to promote safety in all areas of railroad operations and to reduce railroad-related accidents, and to reduce deaths and injuries to persons ..." 45 U.S.C. § 421. The FRSA gave the Secretary of Transportation broad powers to "prescribe, as necessary, appropriate rules, regulations, orders, and standards for all areas of railroad safety." 45 U.S.C. § 431(a). Where such rules were adopted by the Secretary, they would preempt any state "law, rule, regulation, order, or standard relating to railroad safety." 45 U.S.C. § 434.[2] The Supreme Court has held that "[l]egal duties imposed on railroads by the common law fall within the scope of these broad phrases." *CSX Transportation, Inc. v. Easterwood*, 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387, 396–97 (1993).

In *Easterwood* Plaintiff's husband was killed when a train collided with his truck at a crossing. The Supreme Court held that Plaintiff's claim that the railroad breached its common-law duty to operate its train "at a moderate and safe rate of speed" was preempted by the regulations adopted by the Secretary of Transportation pursuant to the FRSA. 113 S.Ct. 1732, 123 L.Ed.2d at 402–04. The Court rejected the plaintiff's argument that common-law speed restrictions were preserved by the "essentially local safety hazard" language of § 434:

> The state law on which respondent relies is concerned with local hazards only in the sense that its application turns on the facts of each case. The common law of negligence provides a general rule to address all hazards caused by lack of due care, not just those owing to unique local conditions. Respondent's contrary view would completely deprive the Secretary of the power to pre-empt state common law, a power clearly conferred by § 434.

*Id.* 113 S.Ct. 1732, 123 L.Ed.2d at 403–04. Amtrak and Chiles contend that Bakhuyzen and Davis' claim of negligence based upon

---

1. There is no dispute that the track was a Class 4 track. Under 49 CFR § 213.9(a) the maximum speed for a passenger train on a Class 4 track is 80 mph. Bakhuyzen and Davis nevertheless suggest that the maximum speed was 60 mph and rose to 79 mph just east of the crossing, because that is the authorized speed in the timetable.

2. Section 434 reads as follows:
   The Congress declares that laws, rules, regulations, orders, and standards relating to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force any law, rule, regulation, order, or standard relating to railroad safety until such time as the Secretary has adopted a rule, regulation, order, or standard covering the subject matter of such State requirement. A State may adopt or continue in force an additional or more stringent law, rule, regulation, order, or standard relating to railroad safety when necessary to eliminate or reduce an essentially local safety hazard, and when not incompatible with any Federal law, rule, regulation, order, or standard, and when not creating an undue burden on interstate commerce. 45 U.S.C. § 434.

train speed is similarly preempted by the FRSA.

Bakhuyzen and Davis respond that *Easterwood* only preempts general allegations of negligence and does not preempt common-law speed claims where a specific condition at a crossing is alleged as the reason for the excessive speed claim. They note that in addition to the "essentially local safety hazard" language of § 434, in *Easterwood* the Court specifically declined to address the preemptive effect of the FRSA upon claims based upon breaches of related tort law duties, "such as the duty to slow or stop a train in order to avoid a specific, individual hazard." 113 S.Ct. 1732, 123 L.Ed.2d at 404 n. 15.[3] Bakhuyzen and Davis have presented the affidavit of their expert, Michael P. Massie, identifying the following "specific, individual hazards" that required Chiles to operate the train at a slower speed: 1) the limited visibility due to snowy weather conditions, 2) the obstructed view from motorists looking westbound at the crossing, 3) the lack of protection at the crossing, and 4) the engineer's admission that this was a dangerous crossing.

With respect to crossing hazards, the Supreme Court noted in *Easterwood* that although the provisions of § 213.9(a) address only the maximum speeds at which trains are permitted to travel given the nature of the track on which they operate, § 213.9(a) "should be understood as covering the subject matter of train speed with respect to track conditions, including the conditions posed by grade crossings." 113 S.Ct. 1732, 123 L.Ed.2d at 402–03.

In line with this language from *Easterwood*, a number of district courts have held that excessive speed claims were preempted by the FRSA despite the fact that the plaintiffs identified specific hazards associated with the particular crossing where the accident occurred. *See, e.g., Herriman v. Conrail, Inc.*, 883 F.Supp. 303 (N.D.Ind.1995)

(hazardous lighting at crossing); *Wright v. Illinois Central Railroad Co.*, 868 F.Supp. 183 (S.D.Miss.1994) (vegetation, grade and angle of crossing, and inadequate warnings); *Earwood v. Norfolk Southern Ry. Co.*, 845 F.Supp. 880 (N.D.Ga.1993) (congested intersection, visibility impaired); *Armstrong v. Atchison, Topeka & Santa Fe Ry. Co.*, 844 F.Supp. 1152 (W.D.Tex.1994) (grade crossing in a high vehicular traffic area which was not equipped with an automatic gate with flashing light signals); *Bowman v. Norfolk Southern Ry. Co.*, 832 F.Supp. 1014 (D.S.C.1993) (crossing used by trucks carrying hazardous materials, heavy traffic, notice of a previous accident), *aff'd*, 66 F.3d 315, 1995 WL 550079 (4th Cir.1995) (Table).

The *Armstrong* court noted that "state common law claims of negligence may be preempted if they attempt to impose additional regulations in an area already occupied by the FRSA or its accompanying regulations." 844 F.Supp. at 1152. Thus, these courts reasoned that crossing hazards did not come within § 434's "essentially local safety hazard" language or within footnote 15's "specific individual hazard" language because the hazards tended to be statewide in character, were capable of being adequately encompassed within uniform national standards, and in fact were the subject of federal regulations. *See, e.g., Bowman*, 832 F.Supp. at 1018.

Bakhuyzen and Davis' allegations that Chiles should have slowed due to the obstructed view, the lack of crossing protections and his knowledge that this was a dangerous crossing all come within the reasoning of the *Easterwood/Bowman* line of cases and are preempted by § 434. Their allegation that the weather conditions required Chiles to slow the train, however, differs materially from the dangerous crossing allegations.

**3.** Footnote 15 reads in pertinent part:
   Petitioner is prepared to concede that the preemption of respondent's excessive speed claim does not bar suit for breach of related tort law duties, such as the duty to slow or stop a train to avoid a specific, individual hazard ... As respondent's complaint alleges only that petitioner's train was traveling too quickly given the "time and place" ... this case does not present, and we do not address, the question of FRSA's preemptive effect on such related claims.
   113 S.Ct. 1732, 123 L.Ed.2d at 404 n. 15.

The analysis the *Herriman* court used when it found preemption of the excessive speed claim based on hazardous lighting is instructive:

> The lighting condition at the crossing did not create a situation which existed solely on the night decedent was killed.... Further, the duty the Herrimans seek to impose is not one that would require this particular engineer to slow down, but in fact would require a substantial reduction in speed by every Conrail train entering the Bond Avenue crossing at night.

*Herriman,* 883 F.Supp. at 307.

■ In contrast to the lighting at the crossing, weather conditions are not static. They arise and abate, requiring independent responses from individual engineers. In this sense they differ materially from the crossing conditions addressed in the cases cited above. Moreover, Amtrak and Chiles have not shown that weather conditions are the subject of federal regulations adopted under the FRSA. Indeed, weather conditions are not capable of being adequately encompassed within uniform national standards. Maximum train speeds, like automobile speed limits, do not remove from the driver the obligation to exercise due care when and if the circumstances such as poor visibility due to snow make operation at the maximum speed careless.

The Court is satisfied that the question of whether Chiles had a duty to slow the train due to snowy weather conditions is not preempted by the FRSA.

### B. Warning of Train's Approach

Bakhuyzen and Davis allege that the engineer failed to continuously sound his whistle up to the point of impact. They contend this failure is in breach of a duty created by M.C.L. § 466.13; M.S.A. § 22.272 and/or Michigan common law.

In response, Amtrak and Chiles contend that there are no rules or statutes that require the engineer to sound the whistle when approaching a private crossing. In addition, they contend that there is no question of fact that Chiles was sounding the whistle at the point of impact.

■ The train whistle statute, by its terms, applies to "any highway crossing" and to "street crossings in incorporated cities and villages." M.C.L. § 466.13; M.S.A. § 22.272. The cited statute does not apply to private crossings. *Burt v. Detroit G.H. & M. Ry. Co.,* 262 Mich. 204, 247 N.W. 157 (1933).

■ Amtrak and Chiles are correct in their assertion that the statute is not applicable. They have not, however, responded to Bakhuyzen and Davis' assertion that the duty to sound the whistle through the intersection may arise under common law:

> Where trains have customarily sounded warning bells upon approaching a particular crossing, a duty may arise to continue that practice, particularly where there is heavy fog. Custom may be established by the testimony of residents who live in the neighborhood of the crossing or by the testimony of railroad employees.

*Kovacs v. C. & O. Ry. Co.,* 134 Mich.App. 514, 524, 351 N.W.2d 581 (1984) (citing *Beasley v. Grand Trunk Western Ry. Co.,* 90 Mich.App. 576, 593, 282 N.W.2d 401 (1979)), *aff'd,* 426 Mich. 647, 397 N.W.2d 169 (1986).

Bakhuyzen and Davis have presented the following testimony of Chiles:

Q. So you would agree then from a safety standpoint it would not be a reasonably prudent practice to run a train, your train through that crossing without having your horn activated and on and audible to the public?

A. That is correct.

Q. Okay. For example, you wouldn't want to go through that crossing with a four to ten second delay without a horn prior to that crossing, would you?

A. Absolutely not.

Q. That would not be a reasonably safe and prudent way to operate a train through that crossing, would it?

A. To operate through there with no horn?

Q. Right. Four to ten seconds prior to the crossing.

A. No, sir, it wouldn't.

(Chiles dep. pp. 54–55).

█ In light of Chiles' testimony, there is at least a question of fact as to whether the railroad had a duty, or assumed the duty, to sound the whistle at this private intersection.

Assuming there was a duty to sound the whistle at this crossing, Amtrak and Chiles have presented direct evidence that the train whistle was being sounded up to the time of the accident. Chiles testified that he was sounding the whistle at the point of impact. Amtrak's train expert, Robert McRae, has also given his opinion based upon his review of the Pulse Event Recorder, that the horn was blowing, possibly with brief pauses, for more than 1/4 mile prior to collision up to the approximate time of the collision.

In support of their assertion that the train whistle was not properly sounded, Bakhuyzen and Davis have presented Janet Scholten's statement to an investigator 15 days after the accident in which she indicated that the train had not been sounding its whistle for approximately five seconds prior to entering the crossing. They have also presented a videotape from a nearby convenience store which they contend confirms that the train whistle was not continuously sounded.

Amtrak and Chiles argue that this evidence is insufficient to create a question of fact for trial. With respect to the videotape, Amtrak and Chiles contend that this negative evidence, offered without a sufficient showing as to its reliability, is insufficient to create a question of fact for trial, particularly when viewed against the conflicting positive testimony of Scholten and Meyers.

With respect to Scholten's statement to the investigator, Amtrak and Chiles contend that the unsworn statement which Scholten retracted at her deposition, is not substantive evidence admissible at trial.

█ Amtrak and Chiles' arguments regarding the video tape and Scholten's testimony are essentially a matter of how much weight should be accorded the evidence. In a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.... The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Morales v. American Honda Motor Co., Inc.,* 71 F.3d 531, 535 (6th Cir.1995) (quoting *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. 2505 (citation omitted)). *See also Russo v. City of Cincinnati,* 953 F.2d 1036, 1041–42 (6th Cir. 1992).

Having viewed the video tape, the Court observes that more than one reasonable conclusion could be drawn from this piece of evidence. What weight will be given to that video tape is a question for the jury, not for this Court.

As to Scholten's statement, the Court observes that Bakhuyzen and Davis are not merely offering the record of the unsworn interview as evidence. They are also offering Scholten's deposition testimony where she arguably adopts the statement from the interview:

A. I am just saying I didn't say that the train whistle did not blow the last five seconds. I said, "Maybe not the last five seconds." He said, "So no whistle for the last five seconds, would that be fair to say?" I said, "That would be close. That would be fair."

Q. That would be fair?

A. That maybe it did not blow for five seconds.

Q. Okay.

A. If that's what I said, that's probably closer to the truth than what I can recall now, two years later. But I did not definitely say in this statement that it did not blow for five seconds, but maybe that would be close.

(Scholten dep. pp. 87–88). This evidence can properly be considered and weighed by the jury.

The Court is satisfied that there is a question of fact for trial as to whether the whistle was properly sounded prior to the accident.

## C. Remaining Claims

Amtrak and Chiles contend that if the claims for excessive speed and not properly

sounding the whistle fail, then Bakhuyzen and Davis, remaining claims against Amtrak and Chiles must fail as well.

Because the Court finds that the allegation of excessive speed and failure to properly sound the whistle survive the motion for summary judgment, the remaining allegations of failure to keep a proper lookout and failure to operate the train in a careful and prudent manner, which are premised on the first two allegations, also survive the motion for summary judgment.

For the reasons stated, Amtrak and Chiles' motions for summary judgment will be granted as to the fifth allegation of negligence—i.e., failure to brake—and denied as to all remaining allegations of negligence.