# IN THE COURT OF APPEALS OF IOWA

No. 18-2039
Filed February 19, 2020

**RICHARD J. WERMERSKIRCHEN and CAROL M. WERMERSKIRCHEN,**
    Plaintiffs-Appellants,

**vs.**

**CANADIAN NATIONAL RAILROAD, a/k/a CN, a/k/a CN RAILWAY; CHICAGO CENTRAL & PACIFIC RAILROAD, a/k/a CCP ILLINOIS CENTRAL RAILROAD COMPANY; TIM DORSEY, and JOSH YOKEM,**
    Defendants-Appellees.
_____

Appeal from the Iowa District Court for Black Hawk County, Linda M. Fangman, Judge.

A road grader operator appeals a partial summary judgment ruling and trial rulings in favor of the defendant railroad and its employees. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Jordan M. Talsma and John R. Walker, Jr. of Beecher, Field, Walker, Morris, Hoffman & Johnson, P.C., Waterloo, for appellant.

Kellen B. Bubach and R. Todd Gaffney of Finley Law Firm, P.C., Des Moines, for appellee.

Heard by Doyle, P.J., and Tabor and Schumacher, JJ.

**TABOR, Judge**

Richard Wermerskirchen suffered serious injuries when a freight train struck the road grader he was operating at a railroad crossing in rural Black Hawk County. Wermerskirchen sued the Chicago, Central & Pacific Railroad Company (CCP)[1] and its crew for negligence. The district court granted the CCP's motion for summary judgment on claims of failure to keep a proper lookout and failure to slow or stop the train. The court decided the Federal Railroad Safety Act of 1970 (FRSA) preempted those common law claims. The court submitted the case to a jury on Wermerskirchen's claim that the crew failed to sound an audible warning. The jury found no negligence. Wermerskirchen appeals both the summary judgment and trial rulings.

After closely examining the law on federal preemption, we disagree with the district court's summary judgment ruling. We remand for further proceedings on those tort claims. But because we find no error in the district court's evidentiary rulings or jury instructions during the trial, we affirm the jury verdict.

## I. Facts and Prior Proceedings

Freezing rain fell and dense fog shrouded rural Black Hawk County the fateful January morning in 2013. The county dispatched Wermerskirchen to scarify (or "rough up") the gravel surfaces to improve traction for drivers. Operating a forty-foot-long John Deere 772G road grader, Wermerskirchen approached a railroad crossing on South Nesbit Road just after 9:30 a.m. Wermerskirchen had

---

[1] The CCP operates as the Canadian National Railroad. We will refer to the company as CCP in this opinion.

traversed the tracks at this rural crossing well over 100 times before. In fact, he was about to cross the tracks for the third time that morning. As he approached the crossing, he elevated the plow and scarifier.[2] Meanwhile, a freight train was heading westbound on the track intersecting South Nesbit Road. Engineer Timothy Dorsey and conductor Joshua Yokem were operating the train at forty-seven miles per hour.

As Wermerskirchen reached the crossing, he was travelling an estimated eight to twelve miles per hour. The temperature was thirty-one degrees, and visibility was limited. Wermerskirchen decided to keep his road grader moving to minimize the time it would take to cross the tracks. Because of its bulk, the grader took far more time to accelerate from a stopped position than an average-sized vehicle did.

As the grader's front tires crossed the northernmost rail of the tracks, the CCP train appeared out of the fog from the east. To avoid placing his body directly in the train's path, Wermerskirchen made a snap judgment not to accelerate. He stopped the grader before the cab crossed the tracks. Dorsey and Yokem, anticipating the impact, threw themselves to the floor without activating the train's brakes. The train hit the front portion of the grader and continued travelling at the same speed for about one-half mile after the collision.

Meanwhile, the crash ejected Wermerskirchen out the grader's back window. He landed in a ditch thirty yards away. He laid on the ground in pain,

---

[2] Wermerskirchen testified: "This particular grader had what was called a lift kit on it which is a hydraulic cylinder that would lift that V-pick up. On this V-pick it had teeth on it. And so when you sat that down, it would scarify the dirt or loosen the dirt."

soaked in diesel fuel, and unable to move because he was trapped under a heavy metal bar. Once the train stopped, the crew ran back to help Wermerskirchen. Yokem unsuccessfully tried to lift the metal bar. Emergency medical technicians eventually arrived and were able to free Wermerskirchen from the debris.[3]

A video camera onboard the CCP's lead locomotive recorded the crash. The video shows Wermerskirchen did not stop or yield to the train. The train's horn can be heard on the recording before the train entered the crossing. The CCP also equipped the lead locomotive with an "event-recorder" to log functions such as speed, braking, and operation of the whistle and bell. The event-recorder revealed the crew activated the horn and bell before the train reached the crossing. The crew also turned on the headlight and ditch lights.[4]

In December 2014, Wermerskirchen and his wife Carol sued Dorsey, Yokem, and their employer, the CCP, for personal injury and loss of consortium. Wermerskirchen alleged the defendants were negligent in failing to apply the brakes in a timely manner, failing to maintain a proper lookout, failing to operate the train at a permissible speed given the limited visibility, and failing to sound an audible warning sufficiently in advance of the crossing.

---

[3] Wermerskirchen suffered a broken pelvis, ankle, and knee, as well as five broken ribs. He also sustained three fractures to his spine, which required surgeons to insert metal rods into his back. After twelve days at the hospital and multiple surgeries, Wermerskirchen moved to a rehabilitation center. There, he used a wheelchair and walker for a few weeks until he was able to walk unassisted. Even after his rehabilitation, Wermerskirchen can no longer play golf, ride horses, or go camping and boating—activities he used to enjoy.

[4] The railroad also had caution signs in place. Cross bucks and a yield sign, both bearing reflectors in good condition, marked the intersection. Another advance yellow warning sign was installed 700 feet from the crossing.

In July 2017, the defendants moved for summary judgment. That fall, the district court granted summary judgment as to the speed, braking, and lookout claims, but denied summary judgment on claims regarding the train's horn. After a six-day trial, the jury returned a verdict finding the defendants were not negligent. Wermerskirchen now challenges the summary judgment and trial rulings.[5]

## II. Analysis

## A. Summary Judgment Claims

### 1. Scope and Standard of Review

We review the grant of summary judgment for correction of errors at law. *Kragnes v. City of Des Moines*, 714 N.W.2d 632, 637 (Iowa 2006). Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits reveal no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. *Hegg v. Hawkeye Tri-Cty. REC*, 512 N.W.2d 558, 559 (Iowa 1994). On appeal of a summary judgment ruling, we must decide whether a genuine issue of material fact exists and if the district court correctly applied the law. *Id.* We view the evidence in the light most favorable to the party opposing the motion for summary judgment. *Murtha v. Cahalan*, 745 N.W.2d 711, 713–14 (Iowa 2008).

---

[5] Wermerskirchen asked our supreme court to retain this appeal because it "has never ruled on the scope of federal preemption with respect to the particular negligence claims" he is asserting. The CCP urged transfer because the United States Court of Appeals for the Eighth Circuit decided a similar preemption issue. *See Grade v. BNSF Ry. Co.*, 676 F.3d 680 (8th Cir. 2012). The Iowa Supreme Court transferred this case to us. Because no Iowa appellate rulings are on point, we take guidance from the case law of other jurisdictions.

### 2. Federal Preemption and the FRSA

Here, the district court premised the grant of summary judgment on its determination the FRSA preempted Wermerskirchen's claims of failure to keep a proper lookout and failure to slow or stop the train. A brief discussion of federal preemption in general and that particular federal law will help set the stage.

The federal preemption doctrine originates in the supremacy clause of the United States Constitution. U.S. Const. art. 6, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any thing in the Constitution or Laws of any State to the Contrary notwithstanding."). "Federal preemption is explicit when Congress expressly states its intention to preempt state law; preemption is implicit when Congress indicates its intention to occupy an entire field of regulation." *Lubben v. Chi Cent. & Pac. R.R. Co.*, 563 N.W.2d 596, 599 (Iowa 1997). Because courts are reluctant to find preemption, the party seeking to establish preemption must show Congress had that "clear and manifest purpose." *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 664 (1993).

Congress enacted the FRSA "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C § 20101. The FRSA contains this explicit preemption clause:

> (1) Laws, regulations, and orders related to railroad safety . . . shall be nationally uniform to the extent practicable.
> (2) A State may adopt or continue in force a law, regulation, or order related to railroad safety . . . until the Secretary of Transportation . . . prescribes a regulation or issues an order covering the subject matter of the State requirement. A State may adopt or continue in force an additional or more stringent law,

regulation, or order related to railroad safety . . . when the law, regulation, or order—
    (A) is necessary to eliminate or reduce an essentially local safety . . . hazard;
    (B) is not incompatible with a law, regulation, or order of the United States Government; and
    (C) does not unreasonably burden interstate commerce.

49 U.S.C § 20106 (a).

Significantly, under the language of that clause, the FRSA will not preempt state law if the federal regulations merely "touch upon" or "relate to" the topic; those regulations must "cover" the same subject matter. *Easterwood*, 507 U.S. at 664. In other words, "pre-emption will lie only if the federal regulations substantially subsume the subject matter of the relevant state law." *Id*. As courts have found, preemption under the FRSA "is even more disfavored than preemption generally." *Murphy v. Town of Darien*, 210 A.3d 56, 70 (Conn. 2019) (quoting *United Transp. Union* v. *Foster*, 205 F.3d 851, 860 (5th Cir. 2000)).

To be sure, the Secretary of Transportation has issued regulations setting maximum train speeds based on track characteristics. *See, e.g.,* 49 C.F.R. § 213.9. "On their face, the provisions of § 213.9(a) address only the maximum speeds at which trains are permitted to travel given the nature of the track on which they operate. Nevertheless, related safety regulations adopted by the Secretary reveal that the limits were adopted only after the hazards posed by track conditions were taken into account." *Easterwood*, 507 U.S. at 674. *Easterwood* held an excessive speed claim brought in a wrongful-death action in Georgia state court could not stand because those regulations "covered the subject matter" in question. *Id*. at 675.

But *Easterwood* did not stop at that holding, instead offering this long-debated enigmatic dicta:

> Petitioner is prepared to concede that the pre-emption of respondent's excessive speed claim does not bar suit for breach of related tort law duties, such as the duty to slow or stop a train to avoid a specific, individual hazard. . . . As respondent's complaint alleges only that petitioner's train was traveling too quickly given the "time and place," . . . this case does not present, and we do not address, the question of FRSA's pre-emptive effect on such related claims.

*Easterwood*, 507 U.S. at 675 n.15.

Some courts have treated the "specific, individual hazard" language in *Easterwood*'s footnote fifteen as synonymous with the preemption exception for "an essentially local safety hazard" in section 20106(a)(2)(A). *See, e.g.*, *Van Buren v. Burlington N. Santa Fe Ry. Co.*, 544 F. Supp. 2d 867, 880 (D. Neb. 2008); *Stone v. CSX Transp., Inc.*, 37 F. Supp. 2d 789, 795 (S.D. W. Va. 1999); *Gunn v. Atchison, Topeka & Santa Fe Ry. Co.*, 13 S.W.3d 52, 54 (Tex. Ct. App. 1999). But more courts have recognized the two exceptions to preemption under the FRSA as distinct from one another. *See, e.g.*, *Stevenson v. Union Pac. R.R Co.*, 110 F. Supp. 2d 1086, 1088–89 (E.D. Ark. 2000) ("A 'specific, individual hazard' is not to be confused with the statutory 'essentially local safety hazard' set forth in 49 U.S.C. § 20106."); *Dresser v. Union Pac. R.R Co.*, 809 N.W.2d 713, 723 (Neb. 2011) (noting plaintiff's claim related to an event which was not a fixed feature of the crossing considered by the national speed regulations); *Veit ex rel. Nelson v. Burlington N. Santa Fe Corp.*, 249 P.3d 607, 617 (Wash. 2011) (finding neither exception applied to motorist's tort claim that train crossing was "ultrahazardous").

Courts have interpreted the statutory phrase—"essential local safety hazard"—as "the type of hazard that is properly dealt with on a local level" or as

one that is not "adequately encompassed within national uniform standards." *Union Pac. R.R Co. v. Cal Pub. Utils Comm'n*, 346 F.3d 851, 860 (9th Cir. 2003); *Nat'l Ass'n of Regulatory Util. Comm'rs v. Coleman,* 542 F.2d 11, 14–15 (3d Cir. 1976). While similar, the typical definition of "a specific, individual hazard" evokes a more temporary situation. *See, e.g.*, *Williams v. Norfolk S. Corp.*, 322 F. Supp. 3d 896, 903 (N.D. Ind. 2018) ("The predominant view among courts is that the duty to stop for a specific, individual hazard arises when a 'transient condition . . . could lead to a particular accident."); *Partenfelder v. Rohde*, 850 N.W.2d 896, 911 (Wis. 2014) (defining term as "a particular hazard that poses the risk of an imminent danger of a collision under circumstances that the Secretary could not have taken into consideration when promulgating uniform, national regulations"). Wermerskirchen argues the "specific, individual hazard" exception to preemption.

### 3.    District Court Ruling

In its summary judgment ruling, the district court relied on *Grade* to find Wermerskirchen's claims preempted. *See* 676 F.3d at 682. In *Grade*, a motorist hit a flatbed railcar that was stopped at a railroad crossing. *Id*. The flatbed railcar was parked unattended on a BNSF railroad track while awaiting a crew change. *Id*. Grade sustained serious injuries in the collision and sued for negligence under state law. *Id*. Among his claims, Grade argued BNSF failed to park the flatcars at a safe distance from the crossing and failed to have adequate warning devices. *Id*. BSNF won summary judgment, arguing the FRSA preempted Grade's common law claims. *Id.*

On appeal, Grade urged his claims should survive based on the local-conditions savings clause in section 20106(a)(2). *Id*. at 686. Specifically, he

argued the "heavy fog and ice" on the day of the collision required "extra warnings to be in place." *Id.* The Eighth Circuit rejected that argument, reasoning, "In implementing the national regulations, the Secretary of Transportation was surely aware that fog would exist along railroad tracks on many occasions and that ice storms would occur." *Id.* at 687.

Here, the district court leaned on *Grade's* reference to weather conditions similar to those in Black Hawk County on the morning of the train's collision with Wermerskirchen's road grader.

> "[T]he Secretary of Transportation was surely aware that fog would exist along railroad tracks on many occasions and that ice storms would occur. These conditions are not uniquely local in character and could be adequately addressed at the national level." *Grade*, 676 F.3d at 687. The local condition that both parties look to in this case is the dense fog that was present on the morning, alleging that the train was moving too quickly for the poor visibility conditions based on the fog that hindered their ability to see a reasonable distance ahead of them.

On the flipside, the district court rejected Wermerskirchen's reliance on *Bakhuyzen v. Nat'l Rail Passenger Corp.*, 20 F. Supp.2d 1113 (W.D. Mich. 1996). In *Bakhuyzen*, the court addressed both the "essentially local safety hazard" clause in the FRSA and the "specific, individual hazard" language from *Easterwood*. *Id.* at 1116–17. *Bakhuyzen* held "weather conditions are not capable of being adequately encompassed within uniform national standards." *Id.* at 1118. The court explained "weather conditions are not static. They arise and abate, requiring independent responses from individual engineers." *Id.* Borrowing that explanation, Wermerskirchen argued the impaired visibility due to fog at the time of the collision constituted a "specific, individual hazard."

Unmoved, the district court observed that the perspective in *Bakhuyzen* was "not widely adopted." The district court reasoned, "In most cases where the 'specific individual hazard' exception has been applied the hazard is along the lines of an individual or a child entering into the train tracks in a discrete situation. Weather conditions are construed broadly enough that they could be considered in the drafting of legislation." The district court was not wrong on this point. In fact, counsel for Wermerskirchen acknowledged at oral argument that *Bakhuyzen* was an outlier in finding a duty to slow due to adverse weather conditions was not preempted. *See Kankakee, Beaverville & S. R.R. Co. v. McLane Co.*, No. 4:08-cv-00048, 2010 WL 3672228, at *4 (N.D. Ind. Sep. 10, 2010) ("Most courts examining the issue have held that adverse weather conditions do not constitute a specific, individual hazard.") (collecting cases).

As its bottom line, the district court found the FRSA preempted Wermerskirchen's claims because the federal regulations set the speed for that stretch of Black Hawk County track at sixty miles per hour and the CCP train was traveling only forty-seven miles per hour. The court found Wermerskirchen's claims regarding failure to keep a proper lookout and failure to brake were preempted because they "directly related" to the claim of excessive speed.

On appeal, Wermerskirchen criticizes the district court's reliance on *Grade*. He points out the Eighth Circuit did not address the common law exception for a "specific, individual hazard" but rather focused on the "essentially local safety hazard" exception from the statute. *See Grade*, 676 F.3d at 686–87. Wermerskirchen also insists failure to keep proper lookout and failure to stop or slow the train differ from the inadequate warning device claim analyzed in *Grade*.

He contends, "Given the presumption against preemption, the district court erred in extending the holding in *Grade*."

In response, counsel for the CCP acknowledged at oral argument that *Grade* was not controlling precedent but ventured that it offered the most persuasive analysis for finding preemption in Wermerskirchen's case. The railroad minimized the distinction between the two exceptions to preemption, arguing: "it would be nonsensical for the *Grade* court to conclude that weather conditions such as fog are general conditions capable of being addressed by uniform national standards but also are specific, individual hazards sufficient to defeat preemption."

For all that, we are not convinced the district court's summary judgment ruling rises or falls on *Grade's* applicability. Because the Eighth Circuit did not probe the meaning of the *Easterwood* footnote, its decision provides little guidance on the preemption exception urged by Wermerskirchen. *Grade* also did not involve the same acts of negligence alleged here. Thus, we examine additional case law from other jurisdictions as we consider whether the court was correct in finding the FRSA preempted Wermerskirchen's claims for failure to keep a proper lookout and failure to stop or slow the train.

### 4. Common Law Duties

Wermerskirchen contends the district court should have allowed the jury to consider his dual contentions that the train crew failed to maintain a proper lookout to identify his road grader as a "specific and individual hazard" *and* should have applied the brakes before the collision. Instead, the district court found both claims preempted because they "relate to the excessive speed claim."

### a. Duty to Keep a Proper Lookout

We start with the proper-lookout claim. In the context of the motoring public, the duty to maintain a proper lookout includes watching the movements of one's own vehicle as well as "other things seen or seeable." *Diehl v. Diehl*, 421 N.W.2d 884, 887 (Iowa 1988). The law imposes a duty on motorists "to proceed with such care and with the vehicle under such control as existing conditions known or which should be known may require." *Sonnek v. Warren*, 522 N.W.2d 45, 49 (Iowa 1994), (quoting *Diehl*, 421 N.W.2d at 889).

By the same token, train crews have a general duty to keep a proper lookout for motorists approaching a crossing.[6] *Murrell v. Union Pac. R.R. Co.*, 544 F. Supp. 2d 1138, 1155 (D. Or. 2008); *see also Simmons v. Chi, Rock Island & Pac. Ry. Co.*, 252 N.W. 516, 517–18 (Iowa 1934) (recognizing duty imposed upon the railroad, while operating its trains, to keep a proper lookout through its employees); *Garcia v. Iowa Interstate R.R., Ltd*, No. 11-1721, 2013 WL 988635 (Iowa Ct. App. Mar. 13, 2013).

Contrary to the district court's conclusion, Wermerskirchen's proper-lookout claim does not fall to the preemptive effect of the FRSA. The duty to keep a proper lookout is not inexorably tied to claims of excessive speed and thus is not preempted under *Easterwood*. *See Woods v. CSX Transp., Inc.*, Nos. 2:07-CV-29, 2:07-CV-30, 2008 WL 5070352, at *9 (N.D. Ind. Nov. 24, 2008) ("The FRSA does not preempt claims relating to the separate and distinct duty to keep a proper

---

[6] Train crews may presume motorists will stop short of a crossing when a train approaches; but a train crew has a duty to use ordinary care to prevent injury when it is apparent motorists will be caught on the track when the train crosses. *Nye v. CSX Transp., Inc.*, 437 F.3d 556, 567 (6th Cir. 2006).

lookout, and once faced with a specific individual hazard, a duty to slow or stop the train."); *Dresser*, 809 N.W.2d at 723 (finding claim of failure to keep a proper lookout was not preempted, reasoning: "The mere fact that the speed the train is traveling is tangentially related to how quickly it can be stopped does not transform the claim into an excessive speed claim."); *see also Skrovig v. BNSF Ry. Co.*, 855 F. Supp. 2d 933, 938 (D.S.D. 2012) (noting railroad did not argue that preemption barred plaintiff's claim of failure to keep a proper lookout); *Cameron v. Wall*, No. 2:09-CV-234-KS-MTP, 2011 WL 554076, at *5 (S.D. Miss. Feb. 7, 2011) ("Defendants concede that Plaintiff's claims that the train crew failed to keep a proper lookout or apply the train's emergency braking system in time are not preempted.").

The duty to keep a proper lookout is heightened when visibility is lessened. *See Coulthard v. Keenan*, 129 N.W.2d 597, 600–01 (Iowa 1964) (explaining "duty of a motorist to stop if he has entirely lost visibility is included within his duty to maintain a proper lookout"). Generally, our case law maintains the duty of keeping a proper lookout includes not only using ordinary care to discover a person in danger, but also reasonable care in operating one's vehicle to avoid injuring that person. *Id.* Regardless of the train's speed, the crew was obliged to be aware of any upcoming obstacles. Maintaining a proper lookout on the tracks ahead remained a continuous obligation while the train was moving.

Although we don't decide the dense fog, standing alone, was a "specific individual hazard" as that phrase was used in *Easterwood*, we do find the limited visibility to be relevant when deciding whether the crew maintained a proper lookout. Deciding whether the crew kept a proper lookout and deciding whether

the dense fog affected its ability to do so are fact questions for a jury to decide. We disagree with the district court's conclusion that Wermerskirchen's proper-lookout claim was speed based and thus preempted.

### b. Duty to Stop or Slow the Train

We next turn to Wermerskirchen's allegation the crew was negligent in failing to stop or slow the train before striking the road grader. Like the proper-lookout action, this related claim was not barred under the preemption provision of the FRSA. "[W]e are not presented with any federal regulations that cover a railroad's duty to exercise ordinary care in situations where collisions are imminent." *See Dresser*, 809 N.W.2d at 723.

As discussed above, *Easterwood* held the FRSA preempted a negligence claim where the only allegation was that the train traveled at an excessive speed for the "time and place." But the question of the FRSA's preemptive effect on "related tort law duties" such as the failure "to slow or stop a train to avoid a specific individual hazard" remained an open question. *Easterwood*, 507 U.S. at 675 n.15. Where plaintiffs can show the existence of a "specific, individual hazard," their state tort law actions survive "for breach of the duty to slow or stop the train to avoid such a hazard." *See Hightower v. Kansas City S. Ry. Co.*, 70 P.3d 835, 846 (Okla. 2003).

When deciding whether Wermerskirchen's pleadings present a genuine issue of fact on the existence of a "specific, individual hazard," we look to see how other courts have defined that phrase. For instance, the Wisconsin Supreme Court emphasized: "Imminence and specificity are crucial components of the specific, individual hazard exception to preemption." *Partenfelder*, 850 N.W.2d at 900.

Wermerskirchen contends the approach of his road grader to the crossing constituted a "specific, individual hazard." He argues the video footage generates a genuine issue of material fact about whether the road grader had entered the "zone of danger" when it came into the train crew's view. *See Bryan v. Norfolk & W. Ry. Co.*, 154 F.3d 899, 902 (8th Cir. 1998); *see also Griffin v. Kansas City S. Ry. Co.*, 965 S.W.2d 458, 461 (Mo. Ct. App. 1998) (discussing a "specific, individual hazard" in terms of a vehicle's "unwavering approach" to railroad tracks). Pushing further, Wermerskirchen claims the crew had the duty to apply the brakes to avoid the collision, and the FRSA does not preempt his claim.

The CCP disagrees that Wermerskirchen's approach to the crossing constituted a "specific, individual hazard," relying on *Van Buren*, 544 F. Supp.2d at 867. *Van Buren* held a vehicle's approach to the railroad crossing—at three to four miles per hour—was not a specific, individual hazard that could prevent federal preemption of a state-law negligence claim against the locomotive crew for failure to keep proper lookout. *Id.* at 880. *Van Buren* found the crew had no reason to believe that collision was imminent until vehicle's front tires reached the outermost rail. *Id.* at 881.

Wermerskirchen distinguishes his situation from the facts of *Van Buren*. The collision in *Van Buren* occurred on a "clear and dry summer afternoon" so the train crew had no reason to use extra caution. *See id.* at 870. By contrast, because of the thick fog limiting his ability to see the train coming, Wermerskirchen contends his road grader's approach to the rural crossing became a "specific, individual hazard" not preempted by the FRSA.

Finally, Wermerskirchen posits that adopting the railroad's position would lead to extreme results. For example, as long as the train was traveling within applicable federal speed limits, Dorsey and Yokem could have been wearing blindfolds or had their backs turned without being responsible under a state law negligence action.

We agree with Wermerskirchen that the district court interpreted the speed-related preemption in *Easterwood* too broadly. Not all state tort claims that touch on the topic of a train's duty to brake to avoid a collision could be preempted by the federal regulations setting speed limits. Otherwise, footnote fifteen's reference to "the duty to slow or stop a train" would have no meaning. *See Easterwood*, 507 U.S. at 675 n.15.

We recognize to survive summary judgment, Wermerskirchen had "the burden to produce some evidence, other than speculation or guesswork," that a specific, individual hazard was present at the crossing to be seen by the crew keeping a proper lookout. *See generally Guidroz–Brault v. Mo. Pac. R.R. Co.*, 254 F.3d 825, 829 (9th Cir. 2001). Viewing the summary-judgment record in the light most favorable to Wermerskirchen, we find adequate evidence to generate a jury question. The video recording from the train, available to the district court, showed the road grader moving toward the tracks seconds before the collision. A reasonable factfinder could determine the grader adopted an "unwavering approach" to the crossing. The video also showed the train maintained a consistent speed of about forty-seven miles per hour before and after the collision. The video recording provides some evidence, other than speculation, that the road

grader presented a specific, individual hazard at the crossing to be seen by the crew keeping a proper lookout.

The district court should have denied summary judgment on Wermerskirchen's claims the crew failed to maintain a proper lookout and failed to slow or stop the train. The question whether the grader presented an imminent risk of collision, once the train crew was able to perceive it, is a question of fact for a jury. *See Partenfelder*, 850 N.W.2d at 911 (finding fact question remained on adequacy of the crew's response once it saw the plaintiff's van on the tracks).

### 5. Causation

We read the district court's summary judgment ruling as resting entirely on federal preemption.[7] But the CCP contends "even if the lookout and braking claims were not preempted, those claims fail as to causation, which appears to be the basis for the district court's decision to grant summary judgment." Without directly referencing causation, the district court's ruling noted experts for both the CCP and Wermerskirchen agreed "the train was simply moving too fast and the visibility was too poor" for any action by the crew to have avoided the collision.[8]

"Causation is ordinarily a jury question." *Garr v. City of Ottumwa*, 846 N.W.2d 865, 870 (Iowa 2014). But in some cases it may be decided as a matter of law where plaintiffs fail to produce sufficient evidence. *Id.* On appeal,

---

[7] Wermerskirchen suggests the district court's analysis "blends the issues of preemption and causation."

[8] Plaintiff's expert David Rangel opined that given the speed and limitations of visibility "even maintaining a proper look out would not provide the crew with sufficient time to perceive the risk, react, and initiate braking to avoid the collision." But he also stated the dangerous conditions "robbed the crew of time to react and take defensive measures such as slowing the train."

Wermerskirchen maintains he generated a genuine issue of material fact on the issue of causation.[9] Wermerskirchen questions the defense expert's analysis for the braking distance. He contends that expert did not account for the incline of the track before the scene of the crash and thus overestimated the stopping distance. Wermerskirchen contends he should have been permitted to cross-examine the expert on that issue at trial.

Wermerskirchen further notes neither expert considered that had he noticed the train slowing, he may have made a different calculation about accelerating the grader across the tracks. He urges "[w]hether or not the combination of these actions would have resulted in the collision being avoided entirely or in lessening the force of the impact so as to reduce damages are fact questions the jury should have been permitted to decide." Wermerskirchen points to *Dresser*, where the Nebraska Supreme Court found a genuine issue of material fact as to whether the crew's failure to slow the train was the proximate cause of the collision. 809 N.W.2d at 721. The court determined that, had the train slowed down, the driver might have been able to move off the tracks in time to avoid the accident. *Id.* In addition, the question of whether Wermerskirchen's injuries would have been as extensive if the crew activated the emergency brakes before the collision is a question of fact for the jury to decide.

---

[9] "The essential elements of a tort claim for negligence generally include: (1) the existence of a duty on the part of the defendant to protect [Wermerskirchen] from injury; (2) a failure to perform that duty; (3) a reasonably close causal connection, i.e., legal cause or proximate cause; and (4) damages." *Bockelman v. State, Dep't of Transp.*, 366 N.W.2d 550, 552 (Iowa 1985); *accord Thompson v. Kaczinski*, 774 N.W.2d 829, 834 (Iowa 2009).

We agree with Wermerskirchen that on this record, the causation question could not be decided as a matter of law.

## B.  Trial issues

### 1.  Scope and Standards of Review

The district court generally has broad discretion when determining admissibility of evidence; we will uphold its decision unless we find a clear and prejudicial abuse of that discretion.  *Gamerdinger v. Schaefer*, 603 N.W.2d 590, 594 (Iowa 1999).  We review hearsay rulings for errors at law.  *See State v. Ross*, 573 N.W.2d 906, 910 (Iowa 1998).

We review the denial of a motion for new trial based on the grounds asserted in the motion."  *Fry v. Blauvelt*, 818 N.W.2d 123, 128 (Iowa 2012)(citation omitted).  The new-trial motion in this case alleged flaws in the jury instructions, which we review for legal error.  *See Boyle v. Alum–Line, Inc.*, 710 N.W.2d 741, 748 (Iowa 2006).

### 2.  Admissibility of Evidence

### a.  Near Misses

The district court granted the CCP's motion in limine seeking to exclude testimony the train crew had several "near misses" at other intersections along their route that winter morning.  The court anticipated reconsideration if Wermerskirchen could lay the proper foundation.

Evidence of a near miss is admissible under the same standard as prior accidents.  The proponent must show the prior accident, or near miss, and the accident in question happened under "substantially similar circumstances."  *Kuper v. Chi. & N.W. Transp. Co.*, 290 N.W.2d 903, 909 (Iowa 1980).  Substantially

similar circumstances exist when conditions are comparable and not too remote. *Id.* (citing *Berk v. Arendts*, 117 N.W.2d 905, 909 (Iowa 1962)).

On this record, we cannot find the district court abused its discretion in excluding the near-miss evidence. Wermerskirchen's offer of proof was scarce on details concerning the earlier events. Without proof those events occurred under substantially similar circumstances, the near-miss evidence was inadmissible. *See id.* In addition, Wermerskirchen cannot show he was prejudiced by the exclusion of this evidence. The probative value of an earlier near-miss is low in determining the functioning of the horn at the South Nesbit Road crossing, and the court admitted other substantial evidence on the issue.

### b.      Train Horn Maintenance Manual

The district court also excluded the train horn maintenance manual as inadmissible hearsay. Wermerskirchen tried to offer the manual for impeachment purposes. In question were pages of the manual discussing ice accumulation on the horn. Wermerskirchen argues that passage was admissible to impeach testimony from the defense expert who said he had never seen ice buildup that caused the horn to become muted. Wermerskirchen argues he should have been able to challenge the expert's credibility with information from the manual.

In support of this argument, Wermerskirchen relies on *Actonet, Ltd v. Allou Health & Beauty Care*, where the court allowed admission of a website review for impeachment purposes. 219 F.3d 836, 846–47 (8th Cir. 2000). The CCP defends exclusion of the manual, contending Wermerskirchen offered it for the truth of the matter asserted, not to impeach the expert. We find no error in the district court's analysis of the hearsay issue.

But even if the manual was admissible, any error was harmless. The test for harmless error is: "[d]oes it sufficiently appear that the rights of the complaining party have been injuriously affected by the error or that he has suffered a miscarriage of justice." *State v. Ness*, 907 N.W.2d 484, 488 (Iowa 2018) (quoting *State v. Sullivan*, 679 N.W.2d 19, 29 (Iowa 2004)). We cannot find Wermerskirchen's rights were impacted or he suffered a miscarriage of justice by the exclusion of the manual. The impeachment value of the manual was negligible.

### 3.    Jury Instructions

Jury instructions must convey the applicable law so the jury has a clear understanding of the issues before it. *Thompson v. City of Des Moines*, 564 N.W.2d 839, 846 (Iowa 1997). We consider the instructions "as a whole, and if the jury has not been misled there is no reversible error." *Thavenet v. Davis*, 589 N.W.2d 233, 236 (Iowa 1999). In considering whether an instruction is supported by substantial evidence, we give that evidence the most favorable construction it will bear. *Asher v. OB-Gyn Specialists, P.C.*, 846 N.W.2d 492, 496–97 (Iowa 2014) on other grounds, overruled by *Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 708 (Iowa 2010).

In the district court, Wermerskirchen unsuccessfully objected to six jury instructions. On appeal, he asserts the inaccurate instructions require a new trial. We disagree.

### a.    Fact-of-Accident Instruction

The district court overruled Wermerskirchen's objection to the fact-of-accident instruction, a modified version of Iowa Civil Jury Instruction 700.8. The

instruction stated: "The mere fact an accident occurred or a party was injured does not mean a party was [negligent] [at fault]."

In most cases, this uniform instruction is a correct statement of the law. *See Novak Heating & Air Conditioning v. Carrier Corp.*, 622 N.W.2d 495, 497 (Iowa 2001). But even instructions correctly stating the law should not give undue emphasis to any particular theory. Wermerskirchen contends this instruction unduly emphasized an option that favored defendants. He speculates because jurors were forced to take significant time away from their personal and professional lives, they have an incentive to shorten the deliberation process by using this instruction as an "easy way out."

Because the record includes no evidence the jury would "quickly enter a verdict for convenience," we decline to speculate this instruction favored the CCP. We are unpersuaded this instruction unfairly highlighted the defense theory of the case. We find no error in giving the instruction.

### b.    Assumption-of-Risk Instruction

Wermerskirchen claims the court erred in giving this instruction:

Defendants claim that Wermerskirchen was at fault in one or more of the following particulars:
….
In voluntarily assuming any risks or hazards attendant to traversing the railroad crossing when same was open and obvious.

He contends the record contained no evidence the risk of the oncoming train was "open and obvious" when he started to cross the tracks.

Notably, the parties differ on the meaning of "open and obvious." For his part, Wermerskirchen asserts the risk of crossing was not open and obvious because he was immersed in a fog bank and could not see the train from his

vantage point at the moment his grader traversed the tracks. By contrast, the CCP interpreted "open and obvious" in light of Wermerskirchen's familiarity with the intersection. He had crossed there more than 100 times. He knew trains came at different times with no set schedule. He knew trains came in both directions. And he knew the morning was foggy. Despite knowing these facts, Wermerskirchen decided to assume the risk of crossing without stopping at the yield sign. The CCP argues the instruction properly allowed the jury to find Wermerskirchen at fault for that action.

We find this jury instruction is supported by substantial evidence. Wermerskirchen's familiarity with the intersection and overall conditions contributed to the open and obvious nature of the risk.

### c. Failure-to-Maintain-Control Instruction

The court instructed the jury that "[a] driver must have his or her vehicle under control. It is under control when the driver can guide and direct its movement, control its speed and stop it reasonably fast. A violation of this duty is negligence."

Wermerskirchen contends this instruction was not supported by substantial evidence. He claims the CCP did not claim he failed to maintain control. Nor did the railroad offer evidence Wermerskirchen could not direct the movement of his road grader, control its speed, or "stop it reasonably fast."

The CCP counters that a jury could have concluded Wermerskirchen failed to have his vehicle under control. The video showed Wermerskirchen drove his vehicle past the yield sign without stopping until a portion of his vehicle was on the tracks. We agree substantial evidence supported giving this instruction.

### d. Horn-Audibility Instruction

The court also instructed the jury that the train's horn must be audible: "Each lead locomotive shall be equipped with a locomotive horn that produces a minimum sound level of 96 dB(A) and a maximum sound level of 110 dB(A) at 100 feet forward of the locomotive in its direction of travel. A violation of this regulation is negligence."

Wermerskirchen insists the district court should have granted his request to add the phrase "at the time of the accident" to the end of this instruction. He contends that addition would have made clear the federal standard of care confers an ongoing obligation on the railroad. Wermerskirchen relies on *Hughs v. Union Pacific. Railroad Co.*, No. 5:15-06079-CV-RK, 2017 WL 1609646 (W.D. Mo. Apr. 28, 2017), which emphasizes the timing of the horn blasts.

The train crew sounded the horn 400 times on the day of the accident. The engineer testified the horn was sounded as part of the daily inspection and it was working properly. The instruction reflects the exact language from the federal regulation regarding horn equipment and decibel level. *See* 49 C.F.R, 229. We find no error in not supplementing the instruction.

### e. Sounding-of-Horn Instruction

Also bearing on the volume of the horn, the district court provided this instruction:

> You are instructed that with reference to the question of whether the train's horn was sounded before the accident, it is the law in this state that the positive testimony of a witness that he or she heard the horn as evidence that the horn was, in fact, sounding because it must have been sounding or he or she would not have heard it. On the other hand, the negative testimony of a witness that he or she did not hear the horn is not necessarily evidence that the horn was not

sounded for it may have been sounded and yet not heard by that witness.

Wermerskirchen contends this instruction may have caused the jury to conclude that the disputed issue was whether the crew sounded the horn at all, as opposed to whether they sounded the horn at the appropriate volume. In response, the CCP contends this instruction clarifies for the jury that Wermerskirchen's testimony that he did not hear the horn does not necessarily mean the crew did not sound the horn at the proper time. We agree with the CCP that the instruction was accurate and supported by substantial evidence.

### f. Assume-Ordinary-Care Instruction

Finally, Wermerskirchen argues the district court erred in advising the jury that the CCP could assume a motorist would follow the law:

> You are instructed that the railroad engineer had the right to assume that Wermerskirchen would observe the law until such time as the engineer knew, or in the exercise of ordinary care should have known, that Wermerskirchen would not observe the law.

Seeking more symmetry, Wermerskirchen urges the court should have instead conveyed to the jury that each party had the right to assume the other would obey the laws that applied to them. And that assumption could endure until either party knew, or in the exercise of reasonable care, should have known, the other party would not obey the law. We agree with the district court's conclusion that motorists and railroad engineers must follow different rules. We find no error in the instruction as given.

### III. Summary

To recap, we reverse the summary judgment ruling on preemption and remand for further proceedings on Wermerskirchen's claims the CCP crew failed

to keep a proper lookout and failed stop or slow the train.  We find no error in the district court's evidentiary rulings or jury instructions and so affirm the jury verdict.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**